**No. 26-2126**

**In the United States Court of Appeals for the Tenth Circuit**

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*,

v.

MAGGIE TOULOUSE OLIVER, in her official capacity as Secretary of State of New Mexico,
*Defendant-Appellee,*

NEW MEXICO ALLIANCE OF RETIRED AMERICANS; COMMON CAUSE; CLAUDIA MEDINA; JUSTIN ALLEN,
*Intervenor Defendants-Appellees,*

On Appeal from the United States District Court
for the District of New Mexico
No. 1:25-cv-1193 (Hon. Judith C. Herrera)

# BRIEF OF INTERVENOR DEFENDANTS-APPELLEES COMMON CAUSE, CLAUDIA MEDINA, AND JUSTIN ALLEN

WILLIAM HUGHES
THERESA J. LEE
ETHAN HERENSTEIN
SOPHIA LIN LAKIN
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549 – 2500
whughes@aclu.org

MARÍA MARTÍNEZ SÁNCHEZ
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NEW MEXICO
P.O. Box 566
Albuquerque, NM 87103

*Counsel for the Common Cause Intervenor Defendants-Appellees*

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

INTRODUCTION ........................................ 1

ISSUES PRESENTED FOR REVIEW ........................................ 4

STATEMENT OF THE CASE ........................................ 4

A. Title III of the Civil Rights Act ........................................ 4

B. Factual Background ........................................ 8

1. The United States Seeks to Force the Disclosure of Voter Data in New Mexico and Nationwide. ........................................ 8

2. The United States Seeks to Unlawfully Construct a National Voter Database. ........................................ 11

C. Procedural Background ........................................ 16

SUMMARY OF ARGUMENT ........................................ 18

STANDARD OF REVIEW ........................................ 20

ARGUMENT ........................................ 21

I. THE CRA DOES NOT ENTITLE DOJ TO NEW MEXICO'S SVRL BECAUSE THE SVRL DOES NOT COME INTO SECRETARY OLIVER'S POSSESSION ........................................ 21

II. THE CRA DOES NOT ENTITLE DOJ TO NEW MEXICO'S SVRL BECAUSE DOJ DID NOT PROVIDE THE REQUIRED STATEMENT OF "THE BASIS AND THE PURPOSE" FOR ITS REQUEST. ........................................ 27

A. The Federal Rules of Civil Procedure Apply. ........................................ 28

B. The United States Failed to Comply with the CRA's Basis and Purpose Requirements ........................................ 35

C. The United States Failed to Provide an Adequate Basis ........................................ 39

D. The United States Failed to Provide a Valid Purpose. ........................................ 44

III. THE CRA DOES NOT REQUIRE DISCLOSURE OF SENSITIVE VOTER INFORMATION TO THE FEDERAL GOVERNMENT .......... 52

CONCLUSION .......... 57

STATEMENT REGARDING ORAL ARGUMENT .......... 58

CERTIFICATE OF COMPLIANCE .......... 58

# TABLE OF AUTHORITIES

## Cases


*Alabama v. United States*,
304 F.2d 583 (5th Cir. 1962) .......... 6

*Chevron Mining Inc. v. United States*,
863 F.3d 1261 (10th Cir. 2017) .......... 39

*Coleman v. Kennedy*,
313 F.2d 867 (5th Cir. 1963) .......... 7, 38

*Corner Post, Inc. v. Board of Governors of the Federal Reserve System*,
603 U.S. 799 (2024) .......... 37

*Department of Commerce v. New York*,
588 U.S. 752 (2019) .......... 51

*Donaldson v. United States*,
400 U.S. 517 (1971) .......... 31, 32

*Equal Employment Opportunity Commission v. Burlington Northern Santa Fe Railroad*,
669 F.3d 1154 (10th Cir. 2012) .......... 36

*Equal Employment Opportunity Commission v. TriCore Reference Laboratories*,
849 F.3d 929 (10th Cir. 2017) .......... 36

*Federal Communications Commission v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .......... 54

*Greidinger v. Davis*,
988 F.2d 1344 (4th Cir. 1993) .......... 52

*Honeycutt v. United States*,
581 U.S. 443 (2017) ........ 22

*In re Coleman*,
208 F. Supp. 199 (S.D. Miss. 1962) ........ 7, 34, 56

*Johnson v. Smith*,
104 F.4th 153 (10th Cir. 2024) ........ 20

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962) ........ 7, 32–34, 38, 39, 43, 44, 53, 56

*Navajo Nation v. Dalley*,
896 F.3d 1196 (10th Cir. 2018) ........ 25

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021) ........ 37, 52

*Pino v. Oliver*,
No. 25-2016, 2026 WL 2318219 (10th Cir. 2026) ........ 54

*Project Vote/Voting for America, Inc. v. Long*,
682 F.3d 331 (4th Cir. 2012) ........ 54, 56

*Public Interest Legal Foundation v. Benson*,
136 F.4th 613 (6th Cir. 2025) ........ 47, 48

*Public Interest Legal Foundation v. Bellows*,
92 F.4th 36 (1st Cir. 2024) ........ 54, 56

*Public Interest Legal Foundation v. North Carolina State Board of Elections*,
996 F.3d 257 (4th Cir. 2021) ........ 54

*Speidell v. United States*,
978 F.3d 731 (10th Cir. 2020) ........ 31

*Standing Akimbo, LLC v. United States*,
955 F.3d 1146 (10th Cir. 2020) .......... 31

*United States v. Adams*,
No. 26-cv-00019-CHB-EBA, 2026 WL 2123871
(E.D. Ky. July 23, 2026) .......... 16, 21, 28

*United States v. Aguilar,*
2026 WL 2364502 (D. Nev. Aug. 14, 2026) .......... 16

*United States v. Amore*,
831 F. Supp. 3d 149 (D.R.I. 2026) .......... 16, 28, 35, 40, 44, 45

*United States v. Bellows*,
834 F. Supp. 3d 113 (D. Me. 2026) .......... 16, 21, 28, 44, 48

*United States v. Benson*,
179 F.4th 470 (6th Cir. 2026) .......... 16, 21, 22, 25, 26, 28, 37, 45

*United States v. Benson*,
819 F. Supp. 3d 753 (W.D. Mich. 2026) .......... 16, 21, 25

*United States v. Board of Elections of the State of New York*,
No. 25-cv-1338-MAD/PJE, 2026 WL 1999921
(N.D.N.Y. July 10, 2026) .......... 17, 21, 28

*United States v. Caldwell*,
No. 26-cv-2025, 2026 WL 2186515 (D.N.J. July 29, 2026) .......... 16, 21, 28

*United States v. Cartwright*,
230 F. Supp 873 (M.D. Ala. 1964) .......... 6

*United States v. DeMarinis*,
No. SAG-25-3934, 2026 WL 1780586
(D. Md. June 18, 2026) .......... 17, 21, 28

*United States v. Evans*,
No. CV 25-4403, 2026 WL 2267774
(D.D.C. Aug. 6, 2026) ................................................ 16, 21, 23, 26, 27

*United States v. Fontes*,
832 F. Supp. 3d 944 (D. Ariz. 2026) ................................ 16, 21, 25, 28

*United States v. Galvin*,
830 F. Supp. 3d 122 (D. Mass. 2026).................... 16, 35, 36, 39, 40, 42

*United States v. Griswold*,
No. 25-cv-3967, 2026 WL 2235374
(D. Colo. Aug. 3, 2026) ..................................................... 16, 21, 28, 44

*United States v. Koski*,
No. 26-cv-42-RCY, 2026 WL 2032532
(E.D. Va. July 14, 2026)............................................. 16, 17, 21, 23, 28

*United States v. Matthews*,
No. 3:25-cv-3398, 2026 WL 2212877
(C.D. Ill. July 31, 2026)........................16, 21, 23, 28, 39, 40, 44, 45, 48

*United States v. Mayton*,
335 F.2d 153 (5th Cir. 1964).............................................................4

*United States v. Oregon*,
828 F. Supp. 3d 1092
(D. Or. 2026)....................................5, 16, 28, 39, 40, 44–46, 48, 50, 51

*United States v. Powell*,
379 U.S. 48 (1964)..........................................................................30, 31

*United States v. Scanlan*,
No. 25-cv-371-JL, 2026 WL 1864054
(D.N.H. June 29, 2026) ........................................ 17, 21, 23, 28, 39, 40

*United States v. Schmidt*,
835 F. Supp. 3d 697 (W.D. Pa. 2026).......................... 16, 21, 44, 50, 51

*United States v. Simon*,
No. 25-cv-03761, 2026 WL 2389778 (D. Minn. Aug. 17, 2026) ..........16

*United States v. Thomas*,
No. 26-cv-21-KAD, 2026 WL 2070437
(D. Conn. July 17, 2026) ........................................................... 16, 21

*United States v. Warner*,
No. 26-cv-156, 2026 WL 2018877
(S.D. W. Va. July 13, 2026)............................ 17, 28, 39, 40, 44, 45, 51

*United States v. Weber*,
816 F. Supp. 3d 1168
(C.D. Cal. 2026)...................................16, 28, 34, 39, 40, 44, 45, 50, 51

*United States v. Wisconsin Elections Commission*,
833 F. Supp. 3d 949 (W.D. Wis. 2026)........................................ 16, 21

*Voter Reference Foundation, LLC v. Torrez*,
160 F.4th 1068 (10th Cir. 2025) .......................................................54

*White v. Lucero*,
135 F.4th 1213 (10th Cir. 2025) .......................................................21

**Statutes**

5 U.S.C. § 552 ..........................................................................................53

5 U.S.C. § 552a ........................................................................................53

13 U.S.C. § 214 ........................................................................................23

18 U.S.C. § 1703 ......................................................................................23

18 U.S.C. § 654 .......... 23

26 U.S.C. § 7604 .......... 30

50 U.S.C. § 217 .......... 23

52 U.S.C. § 20501 .......... 8

52 U.S.C. § 20507. .......... 14, 26, 46–48, 51, 54, 55

52 U.S.C. § 20701. .......... 2, 4, 5, 19, 22, 24, 27, 45, 55

52 U.S.C. § 20702 .......... 19, 26

52 U.S.C. § 20703. .......... 2, 4–6, 19, 22, 28, 35, 37, 49, 52, 55

52 U.S.C. § 20705 .......... 6, 28–30, 38

52 U.S.C. § 20901 .......... 8

52 U.S.C. § 21083 .......... 48

52 U.S.C. § 21085 .......... 48, 49

Civil Rights Act of 1957, Pub. L. 85-315, 71 Stat. 634 .......... 4

Civil Rights Act of 1960, Pub. L. 86-449, 74 Stat. 86 .......... 1

Civil Rights Act of 1964, Pub. L. 88-352, 78 Stat. 241 .......... 7

Voting Rights Act, Pub. L. 89-110, 79 Stat. 437 .......... 7

**Other Authorities**

106 Cong. Rec. H5,326 (daily ed. Mar. 11, 1960) .......... 5, 6, 36

106 Cong. Rec. S6,959 (daily ed. March 30, 1960) .......... 29

*Basis*, Merriam-Webster (last visited Apr. 16, 2026) .......... 39

Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, NEW YORK TIMES, Sept. 9, 2025 ........ 11

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, NEW YORK TIMES MAGAZINE, Nov. 16, 2025 ........ 12

Jonathan Shorman, *DOJ Is Sharing State Voter Roll Lists with Homeland Security*, STATELINE, Sept. 12, 2025 ........ 12

Jonathan Shorman, *Trump's DOJ Offers States 'Confidential' Deal to Wipe Voters Flagged by Feds*, STATELINE, Dec. 18, 2025 ........ 14

Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR, Dec. 10, 2025 ........ 11

Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Center for Justice (updated August 6, 2026) ........ 9, 14

Kyle Cheney, *Trump Administration Concedes DOGE Team May Have Misused Social Security Data*, POLITICO, Jan. 20, 2026 ........ 13

Miles Parks & Jude Joffe-Block, *Trump's DOJ focuses in on voter fraud, with a murky assist from DOGE*, NPR, May 22, 2025 ........ 11

Reid Epstein & Nick Corasaniti, *Trump, in an Escalation, Calls for Republicans to 'Nationalize' Elections*, NEW YORK TIMES, Feb. 2, 2026 ........ 15

Sarah N. Lynch, *Justice Dept. Close to Finalizing Deal to Hand over States' Voter Roll Data to Homeland Security, Sources Say*, CBS News. Mar. 26, 2026 ........ 12

The Federalist No. 60 (Alexander Hamilton) ........ 3

United States Commission on Civil Rights, *Report of the U.S. Commission on Civil Rights 1959* (1959) .......... 24

United States Election Assistance Commission, *Election Administration and Voting Survey 2024 Comprehensive Report* (2025) .......... 47

**Rules**

Fed. R. Civ. P. 1 .......... 29

Fed. R. Civ. P. 16 .......... 34

Fed. R. Civ. P. 56 .......... 34

Fed. R. Civ. P. 81 .......... 29, 31

**Regulations**

Executive Order No. 14,399,
91 Fed. Reg. 17125 (Mar. 31, 2026) .......... 16

**Constitutional Provisions**

U.S. Const. art. 1, § 4, cl. 1 .......... 3

## STATEMENT OF PRIOR OR RELATED CASES

*United States v. Griswold*, No. 26-1326 (10th Cir. docketed Aug. 18, 2026), concerns Appellant the United States' demand for Colorado's statewide voter file and raises similar issues to those presented in this case. In addition, as discussed below, this case is one of thirty-one similar lawsuits brought against states and the District of Columbia, which are in various stages of litigation. *See infra* notes 1, 11 (collecting cases).

## STATEMENT OF REASONS FOR A SEPARATE BRIEF

Pursuant to Tenth Circuit Rule 31.3(B), Intervenor Defendants-Appellees Common Cause, Claudia Medina, and Justin Allen state that a separate brief is necessary because they present the perspective of individual voters and raise distinct legal arguments from the other Appellees.

## GLOSSARY

| | |
|---|---|
| **CRA** | Civil Rights Act of 1960 |
| **DHS** | Department of Homeland Security |
| **DOJ** | Department of Justice |
| **EAVS** | Election Administration and Voting Survey |
| **HAVA** | Help America Vote Act |
| **NVRA** | National Voter Registration Act |
| **SVRL** | Statewide Voter Registration List |

## INTRODUCTION

The United States, through the Department of Justice (DOJ), is attempting to seize millions of citizens' sensitive voter data over the objection of their state governments. A unanimous set of two dozen federal courts have rejected those efforts as unlawful, finding that the Civil Rights Act of 1960 (CRA), Pub. L. 86-449, 74 Stat. 86, does not authorize the DOJ to demand private, sensitive voter data or to conduct baseless fishing expeditions into state voter rolls. This Court should do the same.

The United States has demanded that nearly every state in the country turn over its complete and unredacted statewide voter registration list (SVRL). These lists contain the sensitive information of every voter in the state, such as driver's license numbers and partial Social Security numbers. The United States claims that Title III of the CRA, a voting rights statute passed in 1960 to remedy the disenfranchisement of Black voters in the Jim Crow South, entitles the federal government to seize the personal identifying information of hundreds of thousands of New Mexico voters. It does not.

Because the United States' request fails to satisfy Title III of the CRA and comport with federal law in multiple, independent ways, this Court may affirm the district court's order on multiple grounds.

*First*, New Mexico's SVRL does not fall within the "records" subject to DOJ document demands under the CRA. The statute covers only those records that "come into [the] possession" of elections officials—such as the voter registration applications that local officials received from Black voters in the Jim Crow South and refused to process. 52 U.S.C. § 20701. The SVRL is a record *created* by New Mexico, rather than one it obtained.

*Second*, DOJ failed to provide a written "statement of the basis and the purpose" for its demand for New Mexico's SVRL, as expressly required by Title III. *Id.* § 20703. As to the basis, the statute requires an explanation of the factual, rather than legal, underpinnings for its request. DOJ stated no basis whatsoever in its written demand; in the proceedings below and on appeal, it offers conclusory and shifting explanations. DOJ's supposed "purpose" is nonsensical and an obvious pretext for interfering with state voter list maintenance processes and creating an unauthorized national voter database.

*Third*, the relief that DOJ seeks—forced disclosure of hundreds of thousands of New Mexico voters' sensitive, protected data—would impermissibly burden voting and privacy rights, threatening to chill those voters' participation and political activity. The United States rejected New Mexico's offer of a redacted, publicly available version of its SVRL, demanding the unredacted version. Disclosure of this information would be unlawful due to its burden on New Mexico voters' civil rights, even if the CRA otherwise authorized it, meaning the CRA claim fails on this additional ground.

The Framers vested states, not the federal executive or its agencies, with primary responsibility for managing elections, as part of their efforts to protect "the essential rights of the community" to select their own leaders. The Federalist No. 60 (Alexander Hamilton); U.S. Const. art. 1, § 4, cl. 1. No federal law entitles the United States to the private voter data it seeks or allows it to pursue the unlawful ends for which this data is sought. This unprecedented and baseless intrusion into the machinery of our elections must be rejected. The district court correctly dismissed the Complaint. This Court should affirm.

## ISSUES PRESENTED FOR REVIEW

1. Whether a state's SVRL, which is a database created by state elections officials, is a "record[] . . . which come[s] into [their] possession," within the meaning of Title III of the CRA, 52 U.S.C. § 20701?

2. Whether the United States can obtain a covered record under Title III of the CRA where its written "statement of the basis and the purpose therefor," *id.* § 20703, does not include any factual basis and is pretextual?

3. Whether the redaction of sensitive personal information from the New Mexico SVRL would be required to avoid a constitutional violation or a violation of federal privacy law?

## STATEMENT OF THE CASE

### A. Title III of the Civil Rights Act

Congress enacted Title III of the CRA to stop states and localities in the Jim Crow South from denying thousands of Black citizens the ability to register to vote. *See* H.R. Rep. No. 86-956, at 7 (1959). The CRA followed the Civil Rights Act of 1957, Pub. L. 85-315, 71 Stat. 634, Congress' first attempt since Reconstruction to enforce the voting guarantees of the Fourteenth and Fifteenth Amendments. *United States v. Mayton*, 335 F.2d 153, 159 (5th Cir. 1964). With Title III, Congress

sought to empower DOJ "to require the production of [election] records during any investigation it conducts as to complaints that qualified persons have been denied the right to vote in violation of Federal law." *United States v. Oregon*, 828 F. Supp. 3d 1092, 1097 (D. Or. 2026). The statute requires that state and local elections officials retain and preserve "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. These records "shall, upon demand in writing by the Attorney General or his representative . . . be made available for inspection, reproduction, and copying at the principal office of [the] custodian." *Id.* § 20703.

While Congress intended that the Attorney General investigate violations of constitutional rights, some members of Congress, including Florida Congressman William Cramer, were also concerned about DOJ using the powers granted by Title III for "fishing expedition[s]." 106 Cong. Rec. H5,326 (daily ed. Mar. 11, 1960). To address these concerns, Congress adopted Representative Cramer's amendment to Title III, which added a requirement that the Attorney General's demand for records include "a statement of the basis and the purpose therefor." 52

U.S.C. § 20703; *see also* 106 Cong. Rec. H5,326 (daily ed. Mar. 11, 1960). And Congress authorized judicial review of demands under Title III, specifying that "[t]he United States district court for the district in which a demand is made pursuant to [S]ection 20703 of this title, or in which a record or paper so demanded is located, shall have jurisdiction *by appropriate process* to compel the production of such record or paper." 52 U.S.C. § 20705 (emphasis added).

The federal government initially used Title III as intended, to investigate jurisdictions that had effectively denied Black Americans the right to register to vote. *See, e.g.*, *Alabama v. United States*, 304 F.2d 583, 586–89 (5th Cir. 1962) (Title III investigation of registration records showed that discriminatory registration practices led to less than 10% of Black citizens being registered to vote), *aff'd* 371 U.S. 37 (1962); *see also United States v. Cartwright*, 230 F. Supp 873, 875 (M.D. Ala. 1964) (Title III investigation revealed voting registrars engaged in racially discriminatory practices resulting in only 7.5% of Black citizens being registered). And in conducting those investigations, DOJ adhered to the statutory requirement to set forth in writing "the basis and the purpose" for its records demand, 52 U.S.C. § 20703—that is, the factual basis for

why DOJ suspected a potential legal violation as well as its investigatory purpose of how the requested records would bear upon that suspicion. *See, e.g.*, *Kennedy v. Lynd*, 306 F.2d 222, 229 n.6 (5th Cir. 1962); *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).

This robust use of Title III was short lived. Only a few years later, Congress passed the Civil Rights Act of 1964, Pub. L. 88-352, 78 Stat. 241, which outlawed racial segregation. Then, in 1965, Congress passed the Voting Rights Act, Pub. L. 89-110, 79 Stat. 437, which established broad new voter protections, eliminated literacy tests, and led to the enfranchisement of millions of Black citizens. Because Congress enacted more effective voting rights laws, federal court assessment of Title III has largely been silent since 1965. Until the past year, all jurisprudence analyzing the CRA arose during the 1960s in the former Confederate states and pertained to investigations into state and local officials unlawfully denying Black citizens the right to register to vote.

### B. Factual Background

#### 1. The United States Seeks to Force the Disclosure of Voter Data in New Mexico and Nationwide.

On September 8, 2025, DOJ sent a letter to New Mexico Secretary of State Maggie Toulouse Oliver (Secretary Oliver), demanding an electronic copy of New Mexico's SVRL. App. 50 (September 8 Letter). DOJ requested that the voter file be produced with "*all fields*" included. *Id.* (emphasis in original). The Letter cited the National Voter Registration Act (NVRA), 52 U.S.C. § 20501 *et seq.*, the Help America Vote Act (HAVA), 52 U.S.C. § 20901 *et seq.*, and Title III of the CRA in support of the request. App. 50–51. It further stated "[t]he purpose of this request is to ascertain New Mexico's compliance with the list maintenance requirements of the NVRA and HAVA." App. 51. The letter did not elaborate further on this point, nor did it refer to any compliance deficiencies with respect to those statutes, suspected or actual, or any other factual basis for any concerns with New Mexico's list maintenance practices. *Id.*

On September 22, 2025, Secretary Oliver responded, agreeing to provide "a redacted voter file," but clarifying that before she could provide an unredacted version, she was "obligated by law to request further

information, communication, and assurances of privacy protection from DOJ." App. 54. This response further noted that "the CRA requires a statement of the basis and purpose," and that, while DOJ gave evaluating New Mexico's compliance with the NVRA's list maintenance as a purpose, it "has made no attempt to explain why such an evaluation would require the inspection of unredacted private voter information." *Id.*

Months later, on December 2, 2025, the United States filed a civil action against Secretary Oliver. The suit, seeking to compel Secretary Oliver to hand over sensitive voter data, was one of thirty-one nearly identical lawsuits DOJ has initiated against states and election officials across the country. App. 477 & n.9.[1] Its Complaint included one claim, a

---

[1] *See* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (updated August 24, 2026), https://perma.cc/XM9B-7ZWJ. In addition to the case under review here, the cases are: *United States v. McGrane*, No. 26-cv-00197 (D. Idaho filed Apr. 1, 2026); *United States v. Adams*, No. 26-cv-00019 (E.D. Ky. filed Feb. 26, 2026); *United States v. Caldwell*, No. 26-cv-02025 (D.N.J. filed Feb. 26, 2026); *United States v. Henderson*, No. 26-cv-00166 (D. Utah filed Feb. 26, 2026); *United States v. Ziriax*, No. 26-cv-00361 (W.D. Okla. filed Feb. 26, 2026); *United States v. Warner*, No. 26-cv-00156 (S.D. W. Va. filed Feb. 26, 2026); *United States v. Raffensperger*, No. 26-cv-00485 (N.D. Ga. filed Jan. 23, 2026); *United States v. Koski*, No. 26-cv-00042 (E.D. Va. filed Jan. 16, 2026);

demand for records under Title III; it did not include any counts under the NVRA or HAVA or allege any violations thereof.

---

*United States v. Fontes*, No. 26-cv-00066 (D. Ariz. filed Jan. 6, 2026); *United States v. Thomas*, No. 26-cv-00021 (D. Conn. filed Jan. 6, 2026); *United States v. Evans*, No. 25-cv-04403 (D.D.C. filed Dec. 18, 2025); *United States v. Matthews*, No. 25-cv-03398 (C.D. Ill. filed Dec. 18, 2025); *United States v. Wis. Elections Comm'n*, No. 25-cv-01036 (W.D. Wis. filed Dec. 18, 2025); *United States v. Griswold*, No. 25-cv-03967 (D. Colo. filed Dec. 11, 2025); *United States v. Nago*, No. 25-cv-00522 (D. Haw. filed Dec. 11, 2025); *United States v. Galvin*, No. 25-cv-13816 (D. Mass. filed Dec. 11, 2025); *United States v. Aguilar*, No. 25-cv-00728 (D. Nev. filed Dec. 11, 2025); *United States v. Albence*, No. 25-cv-01453 (D. Del. filed Dec. 2, 2025); *United States v. Oliver*, No. 25-cv-01193 (D.N.M. filed Dec. 2, 2025); *United States v. Amore*, No. 25-cv-00639 (D.R.I. filed Dec. 2, 2025); *United States v. Hobbs*, No. 25-cv-06078 (W.D. Wash. filed Dec. 2, 2025); *United States v. DeMarinis*, No. 25-cv-03934 (D. Md. filed Dec. 1, 2025); *United States v. Hanzas*, No. 25-cv-00903 (D. Vt. filed Dec. 1, 2025); *United States v. Benson*, No. 25-cv-01148 (W.D. Mich. filed Sept. 25, 2025); *United States v. NH Secretary of State*, No. 25-cv-00371 (D.N.H. filed Sept. 25, 2025); *United States v. Simon*, No. 25-cv-03761 (D. Minn. filed Sept. 25, 2025); *United States v. Bd. of Elections of New York*, No. 25-cv-01338 (N.D.N.Y. filed Sept. 25, 2025); *United States v. Schmidt*, No. 25-cv-01481 (W.D. Pa. filed Sept. 25, 2025); *United States v. Bellows*, No. 25-cv-00468 (D. Me filed Sept. 16, 2025); *United States v. Weber*, No. 25-cv-09149 (C.D. Cal. filed Sept. 25, 2026); *United States v. Oregon*, No. 25-cv-01666 (D. Or. filed Sept. 16, 2025). DOJ additionally filed a suit in the Middle District of Georgia, which was dismissed for improper venue. *See United States v. Raffensperger*, No. 25-cv-00548, 2026 WL 184233 (M.D. Ga. Jan. 23, 2026).

### 2. The United States Seeks to Unlawfully Construct a National Voter Database.

DOJ's requests for private, sensitive voter data from New Mexico and other states appear to be in connection with novel efforts to construct a national voter database, and to otherwise use untested forms of database analysis to scrutinize state voter rolls and challenge voters' eligibility.

DOJ officials "have been clear that they are interested in a central, federal database of voter information."[2] Within months of the new Administration's taking office, DOJ officials asked staffers from the new "Department of Governmental Efficiency" (DOGE) to identify supposed noncitizens in state voter rolls by matching voter data with data from the Social Security Administration (SSA), efforts which have incorrectly flagged numerous U.S. citizens as ineligible to vote.[3] DOJ has also been coordinating in these novel efforts with the federal Department of

---

[2] *E.g.*, Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES, Sept. 9, 2025, https://perma.cc/2RGY-RCJT.

[3] *E.g.*, Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR, Dec. 10, 2025, https://perma.cc/6P7X-NZXL; Miles Parks & Jude Joffe-Block, *Trump's DOJ focuses in on voter fraud, with a murky assist from DOGE*, NPR, May 22, 2025, https://perma.cc/6QPB-NLZ8.

Homeland Security (DHS), according to reported statements from both agencies.[4]

Around the time that DOJ first began filing these lawsuits, one article extensively quoted a recently-departed lawyer from DOJ's Civil Rights Division, describing DOJ's aims in these cases with respect to the collection and aggregation of voter data:

> We were tasked with obtaining states' voter rolls, by suing them if necessary. Leadership said they had a DOGE person who could go through all the data and compare it to the [DHS] data and Social Security data . . . I had never before told an opposing party, Hey, I want this information and I'm saying I want it for this reason, but I actually know it's going to be used for these other reasons. That was dishonest. It felt like a perversion of the role of the Civil Rights Division.[5]

Administration officials have also been working with outside "election integrity" advocates, apparently mishandling sensitive personal data in the process. For example, as detailed in a federal court filing by DOJ on behalf of the SSA:

---

[4] *See* Sarah N. Lynch, *Justice Dept. Close to Finalizing Deal to Hand over States' Voter Roll Data to Homeland Security, Sources Say*, CBS News. Mar. 26, 2026, https://perma.cc/T66C-RYRC; Jonathan Shorman, *DOJ Is Sharing State Voter Roll Lists with Homeland Security*, STATELINE, Sept. 12, 2025, https://perma.cc/8HCR-S45F.

[5] Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. TIMES MAG., Nov. 16, 2025, https://perma.cc/L39A-S5VZ.

> [I]n March 2025, a political advocacy group contacted two members of SSA's DOGE Team with a request to analyze state voter rolls that the advocacy group had acquired. The advocacy group's stated aim was to find evidence of voter fraud and to overturn election results in certain States. In connection with these communications, one of the DOGE team members signed a "Voter Data Agreement," in his capacity as an SSA employee, with the advocacy group. He sent the executed agreement to the advocacy group on March 24, 2025.

Notice of Corrections to the R. at 5, *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 1:25-cv-596-ELH (D. Md. Jan. 16, 2026), Dkt. No. 197 (*AFSCME* Notice).[6] The filing, which does not specify the terms of the "Voter Data Agreement" or the activities these DOGE actors or others undertook pursuant to it, also indicates that, around the same period, DOGE actors shared unknown amounts of Social Security data on an unapproved third-party server, in a "manner [that] is outside SSA's security protocols." *Id.* at 6.

DOJ has also made clear what it plans to do with this collected data, asking states to sign a memorandum of understanding (MOU) in

[6] *See also* Kyle Cheney, *Trump Administration Concedes DOGE Team May Have Misused Social Security Data*, POLITICO, Jan. 20, 2026, https://perma.cc/4FTL-F7KQ.

connection with its requests. *See* App. 70–78.[7] The MOU purports to vest the United States with substantial new authority to identify supposedly ineligible voters and to compel states to remove these voters from the rolls, depriving them of the franchise. App. 71, 74. Under the MOU's terms, federal officials may take custody of the voter rolls, identify supposed "ineligible voters," and then compel states to "remov[e]" these voters "within forty-five (45) days" and then resubmit their voter lists for additional analysis. App. 74. These removals are purportedly required by the MOU despite the procedural protections afforded by the NVRA, which requires voters to be notified prior to removal and bars systematic removal programs within ninety days of an election, 52 U.S.C. § 20507.[8] The MOU would thereby turn states' own voter rolls into a tool for unlawfully and improperly mass-challenging voters and interfering with the democratic process in the states.

---

[7] In addition to the Colorado version of the MOU included in the Appendix, the copies provided to many other states are aggregated and posted in Martinez-Ochoa, O'Connor, & Berry, *Tracker of Justice Department Requests*, *supra* n.1.

[8] *See also* Jonathan Shorman, *Trump's DOJ Offers States 'Confidential' Deal to Wipe Voters Flagged by Feds*, STATELINE, Dec. 18, 2025, https://perma.cc/QXF5-PWJB

In parallel, DHS has launched an "Unlawful Voter Initiative," tasking hundreds of employees with identifying allegedly ineligible registered voters.[9] Staff must gather voter information from state government sources, using identifying information held by DHS, and if necessary, falsely attesting to that state government that they are the voter or are authorized to access the voter's information. In trainings related to the new initiative, officials have acknowledged that the data sources underpinning this effort erroneously list U.S. citizens as noncitizens. This new Initiative clarifies the administration's plans with the information it seeks in this case.

The actions of the President also demonstrate the administration's aims. Earlier this year, President Trump announced his desire to "take over the voting" and "nationalize" elections in certain states.[10] The next month, the President issued an executive order purporting to require the creation of a national voter registration list. *See* Ensuring Citizenship

---

[9] *See* Letter to Sec'y Markwayne Mullin from Sen. Alex Padilla (Sept. 13, 2026), https://perma.cc/2LAD-25KV.

[10] Reid Epstein & Nick Corasaniti, *Trump, in an Escalation, Calls for Republicans to 'Nationalize' Elections*, N.Y. TIMES, Feb. 2, 2026, https://perma.cc/E75W-SRZD.

Verification and Integrity in Federal Elections, Exec. Order No. 14,399, § 2, 91 Fed. Reg. 17125, 17125–26 (Mar. 31, 2026).

### C. Procedural Background

As noted, the United States has now filed more than thirty lawsuits seeking to obtain state SVRLs under the purported authority of Title III of the CRA. Every court that has passed upon the validity of these actions—now twenty-four courts in all, including the Sixth Circuit—has held that DOJ's demand is unlawful and accordingly dismissed the United States's claims.[11]

[11] *See* App. 472–92; *United States v. Benson*, 179 F.4th 470 (6th Cir. 2026); *United States v. Schmidt*, 835 F. Supp. 3d 697 (W.D. Pa. 2026); *United States v. Bellows*, 834 F. Supp. 3d 113 (D. Me. 2026); *United States v. Wis. Elections Comm'n*, 833 F. Supp. 3d 949 (W.D. Wis. 2026); *United States v. Fontes*, 832 F. Supp. 3d 944 (D. Ariz. 2026); *United States v. Amore*, 831 F. Supp. 3d 149 (D.R.I. 2026); *United States v. Galvin*, 830 F. Supp. 3d 122 (D. Mass. 2026); *United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich. 2026); *Oregon*, 828 F. Supp. 3d 1092; *United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026); *United States v. Simon*, No. 25-cv-03761, 2026 WL 2389778 (D. Minn. Aug. 17, 2026); *United States v. Aguilar*, No. 25-cv-00728, 2026 WL 2364502, at *1 (D. Nev. Aug. 14, 2026); *United States v. Evans*, No. 25-cv-04403, 2026 WL 2267774, at *1 (D.D.C. Aug. 6, 2026); *United States v. Griswold*, No. 25-cv-03967, 2026 WL 2235374 (D. Colo. Aug. 3, 2026); *United States v. Matthews*, No. 25-cv-03398, 2026 WL 2212877 (C.D. Ill. July 31, 2026); *United States v. Caldwell*, No. 26-cv-02025, 2026 WL 2186515 (D.N.J. July 29, 2026); *United States v. Adams*, No. 26-cv-00019-CHB-EBA, 2026 WL 2123871 (E.D. Ky. July 23, 2026); *United States v. Thomas*, No. 26-cv-00021-KAD, 2026 WL 2070437 (D. Conn. July 17, 2026); *United States v. Koski*, No.

The district court below is one of them. On December 18, 2025, Common Cause, a pro-democracy membership organization that fights for voter privacy in New Mexico, *see* App. 57–60; Claudia Medina, a New Mexico voter who, as a naturalized citizen, is at particular risk for improper removal from the rolls, *see* App. 62–64; and Justin Allen, a New Mexico voter whose personal experience restoring his voting rights following incarceration spurred him to become an activist for formerly incarcerated people, *see* App. 66–68, moved to intervene as Defendants. App. 9. They were granted intervention the next day. *Id.* Secretary Oliver, the Common Cause Intervenors, and the New Mexico Alliance for Retired Americans, another Intervenor Defendant, each moved to dismiss. App. 10.

On July 14, 2026, the district court granted the motions. App. 472–92. It found that the Federal Rules of Civil Procedure, including scrutiny under Rule 12, applied to DOJ's suit, rejecting DOJ's argument that it

---

26-cv-42-RCY, 2026 WL 2032532 (E.D. Va. July 14, 2026); *United States v. Warner*, No. 26-cv-00156, 2026 WL 2018877 (S.D. W. Va. July 13, 2026); *United States v. Bd. of Elections of the State of N.Y.*, No. 25-cv-01338-MAD/PJE, 2026 WL 1999921 (N.D.N.Y. July 10, 2026); *United States v. Scanlan*, No. 25-cv-00371-JL, 2026 WL 1864054 (D.N.H. June 29, 2026); *United States v. DeMarinis*, No. SAG-25-3934, 2026 WL 1780586 (D. Md. June 18, 2026).

was entitled to special summary procedures. App. 484–86. It held that the September 8 Letter "altogether lacks an identifiable 'basis'" for DOJ's demand, and that "[s]ubsequent forms, court filings, or 'a curing elaboration letter' cannot retrospectively supplement" it. App. 488, 490. The Letter nowhere "articulate[s] any factual suggestion that New Mexico has violated the NVRA or HAVA, indicate[s] the State has a pattern or practice of noncompliance with the same, nor does it explain how the unredacted [information] is necessary to evaluate compliance with the NVRA and HAVA." App. 490. Because DOJ provided no basis in its written demand, it failed to state a claim for relief, so the district court dismissed its CRA claim. App. 491.

Ten days later, on July 24, the United States noticed this appeal, App. 17, and on August 17, filed its opening brief, *see* Dkt. No. 20 (DOJ Br.).

## SUMMARY OF ARGUMENT

The United States' sole claim is legally deficient three times over, so there are multiple independent bases on which this Court can affirm.

*First*, Title III does not reach the records the United States seeks. Title III covers only documents that "come into [the] possession" of

election officials. 52 U.S.C. § 20701. Secretary Oliver did not obtain the SVRL from some external source, but rather her office *created* it—meaning the SVRL did not "come into [her] possession." *Id.* This textual reading interprets Title III harmoniously with the NVRA and HAVA, which require states to create and maintain their own centralized voter lists—avoiding any conflict between Title III's prohibition on "alter[ing] any covered record," *id.* § 20702, and the NVRA and HAVA's commands to continuously update an SVRL.

*Second*, the Complaint and documents incorporated by reference thereto make clear that the United States did not provide a valid statement of "*the* basis and *the* purpose" for its request. *Id.* § 20703 (emphasis added). DOJ's demand letter contained no factual basis whatsoever evincing any possible violation of any statute had occurred with respect to New Mexico's list maintenance practices. Without any factual basis, DOJ's demand is precisely the type of pure fishing expedition that the statute forbids.

Nor has DOJ provided a valid "purpose." The generalized purpose DOJ points to—ascertaining New Mexico's compliance with the NVRA and HAVA—simply does not match the records demanded. Even if this

purpose corresponded to the records DOJ seeks, the United States' own public statements and other public records demonstrate that this purpose is pretextual. The failure to provide either a sufficient basis or a valid purpose are each independently fatal to the United States' sole claim.

*Third*, the relief sought by the United States—a complete SVRL without redactions to protect the privacy of hundreds of thousands of voters—cannot be granted without running roughshod over New Mexicans' constitutional and privacy rights, and thus cannot be granted at all. This Court can affirm the district court's dismissal order on that ground as well.

## STANDARD OF REVIEW

This Court reviews the grant of a motion to dismiss de novo, "accepting all well-pleaded allegations of the complaint as true and considering them in the light most favorable to the nonmoving party." *Johnson v. Smith*, 104 F.4th 153, 167 (10th Cir. 2024) (quotation marks omitted). Courts may "consider a document central to the plaintiff's claim and referred to in the complaint," as well as "take judicial notice of documents sua sponte as long as the documents have a direct relation to

matters at issue." *White v. Lucero*, 135 F.4th 1213, 1219 (10th Cir. 2025) (internal quotation marks omitted).[12]

## ARGUMENT

### I. THE CRA DOES NOT ENTITLE DOJ TO NEW MEXICO'S SVRL BECAUSE THE SVRL DOES NOT COME INTO SECRETARY OLIVER'S POSSESSION.

This Court can affirm because the United States seeks records that are not covered by Title III in the first place.[13]

Title III requires elections officials to "retain and preserve, for a period of twenty-two months from the date of any" federal election, "all records and papers which come into [their] possession relating to any

[12] While DOJ correctly provides familiar language articulating Rule 12 scrutiny as the standard of review, *see* DOJ Br. at 13, it later argues that the district court erred in applying "the ordinary pleading scrutiny of the Federal Rules of Civil Procedure," *id.* at 15. Not so. As discussed below, Title III's text and structure and binding precedent foreclose this argument. *See* Argument Section I.A.

[13] Sixteen courts evaluating DOJ's demand have held that SVRLs are not covered under Title III, *see Benson*, 179 F.4th at 480–81; *Schmidt*, 835 F. Supp. 3d at 699; *Bellows*, 834 F. Supp. 3d at 124–25; *Wis. Elections Comm'n*, 833 F. Supp. 3d at 955; *Fontes*, 832 F. Supp. 3d at 949; *Benson*, 819 F. Supp. 3d at 770; *Evans*, 2026 WL 2267774, at *5, *11; *Griswold*, 2026 WL 2235374, at *4–5; *Matthews*, 2026 WL 2212877, at *3–4; *Caldwell*, 2026 WL 2186515, at *6–8; *Adams*, 2026 WL 2123871, at *4–5; *Thomas*, 2026 WL 2070437, at *7; *Koski*, 2026 WL 2032532, at *6; *Bd. of Elections of N.Y.*, 2026 WL 1999921, at *11; *Scanlan*, 2026 WL 1864054, at *6; *DeMarinis*, 2026 WL 1780586, at *5.

application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. The statute then obligates officials to turn over "[a]ny record or paper required by [Section 20701] to be retained and preserved," *id.* § 20703. While "all records and papers . . . relating to any application, registration, . . . or other act requisite to voting" is broad language, Title III also provides an immediate textual limitation to those otherwise broad parameters: Only those records or papers that have "come into [the custodian's] possession" must be retained and provided in response to a valid Title III demand. *Id.* § 20701.

The SVRL falls outside the ambit of this text. The phrase "come into . . . possession" in the CRA refers to records that elections officials *obtain* or *receive*, rather than those they *create*. *See Benson*, 179 F.4th at 480 ("Around the time that Congress enacted Title III, the phrase 'come into . . . possession,' meant to 'acquire,' 'obtain,' or 'receive,'" rather than something a state "created . . . themselves"); *see also Honeycutt v. United States*, 581 U.S. 443, 449 (2017) (defining "obtain" as "to get or acquire" and "to come into possession of" in interpreting terms of the Comprehensive Forfeiture Act) (internal quotation marks omitted);

*accord, e.g.*, *Evans*, 2026 WL 2267774, at *6; *Matthews*, 2026 WL 2212877, at *3; *Koski*, 2026 WL 2032532, at *5.

Indeed, Congress regularly uses the language "comes into possession" to refer to something that the subject obtains or acquires, rather than creates. *See, e.g.*, 13 U.S.C. § 214 (prohibiting census staff from disclosing "any information . . . which comes into [their] possession"); 18 U.S.C. § 654 (prohibiting embezzlement of money or property that "comes into [one's] possession"); *id.* § 1703(a) (prohibiting postal employees from delaying or destroying any mail that "come[s] into [their] possession"); 50 U.S.C. § 217 (requiring all military members to report whenever abandoned property "comes into [their] possession"); *see also Scanlan*, 2026 WL 1864054, at *5 ("Congress has consistently employed the phrase 'comes into possession' to describe the process by which a person receives something from an external source . . . .").

The phrase "come into . . . possession" in the CRA thus refers to records that elections officials *obtain*, rather than those they create. And because the SVRL is a continuously updated document created by state officials, it is not a record that "come[s] into [their] possession," and thus falls outside of the reach of the CRA.

This reading is consistent with Title III's aims. The statute was part of an effort to force Southern registrars to accept the voter registration forms submitted by Black voters, rather than destroying them or otherwise rejecting valid registration forms. *See, e.g.*, U.S. Comm'n on Civil Rights, *Report of the U.S. Commission on Civil Rights 1959,* at 93 (1959), *available at* https://www.usccr.gov/files/historical/1959/59-001-U.pdf ("Rejected applications were destroyed approximately 30 days after being rejected, which fact made accurate statistical review of the records impossible"); H.R. Rep. 86-956 at 7 (1959) (describing the importance of viewing materials submitted by voters to elections officials as "an essential step in the process of enforcing and protecting the right to vote"). Title III is at its heart a retention provision that aims to prevent the destruction of materials submitted by would-be voters and to allow federal enforcers to uncover evidence that would-be voters were being denied the right to vote on the basis of race. Indeed, these aims are reflected not just in the statute's "comes into possession" language, but in Title III's subsequent language specifying that the records and papers at issue are those "relating to any application, registration, payment of poll tax, or other act requisite to voting," 52 U.S.C. § 20701—all of which

"'refer to something that the voter submits or does as part of the registration process' and thus refers to 'records that election officials receive, rather than create.'" *Fontes*, 832 F. Supp. 3d at 950 (quoting *Benson*, 819 F. Supp. 3d at 769).

By contrast, to read Title III as applying to *any* documents or records that an elections official *possesses*, including those the official creates, would improperly read language out of the statute, replacing "all records and papers *which come into [their] possession*" with "all records and papers which *they possess*." But this Court "must give effect to all statutory provisions, so that no part will be inoperative or superfluous—each phrase must have distinct meaning." *Navajo Nation v. Dalley*, 896 F.3d 1196, 1215 (10th Cir. 2018).

Reading the statute this way would not just violate textual canons, it would defy normal rules of usage and plain common sense. "An ordinary English speaker would not say that she has come into possession of something that she created, established, and maintained." *Benson*, 179 F.4th at 479. Or as another court explained in rejecting application of Title III to state SVRLs on this basis: "As a matter of common usage, one might say, for example, that the Mona Lisa 'came

into the possession' of the Louvre around 1797; one would not say that the painting 'came into the possession' of Leonardo da Vinci when he completed it around 1517." *Evans,* 2026 WL 2267774, at *6.

And beyond these profound difficulties of text and usage, reading Title III to cover the SVRL would produce bizarre results that Congress could not have intended. Under the CRA, it is a criminal violation for anyone to "willfully steal[], destroy[], conceal[], mutilate[], or alter[] any record or paper required by [Title III] to be retained and preserved." 52 U.S.C. § 20702. Yet the NVRA and HAVA affirmatively "*require* [state] election officials to alter the qualified voter file routinely as part of their 'reasonable efforts' to ensure accuracy." *Benson*, 179 F.4th at 479 (citing 52 U.S.C. § 20507(a)(4)). Accordingly, "construing [Title III] in a manner that subjects the qualified voter file to Title III would place Title III on a collision course with the NVRA and HAVA," an unharmonious and even absurd result. *Id.* at 480.

DOJ may point out, as it did during oral argument below, *see* App. 449:23–50:8, that the SVRL is in part based on an aggregation of materials submitted by voters, but that is of no moment. DOJ "has not requested the records or papers that [New Mexico] obtained in creating

the qualified voter file—[DOJ] has requested the qualified voter file itself," which New Mexico created. *Benson*, 179 F. 4th at 480–81. Further, the SVRL "contains information from diverse sources, many of which have nothing to do with 'act[s] requisite to voting.'" *Id.* at 481 (quoting 52 U.S.C. § 20701); *see also* App. 208–09.[14]

Instead, the far better interpretation is the one that forecloses the United States's position: The SVRL is not covered by Title III. This Court can affirm on that exceedingly straightforward basis alone.

## II. THE CRA DOES NOT ENTITLE DOJ TO NEW MEXICO'S SVRL BECAUSE DOJ DID NOT PROVIDE THE REQUIRED STATEMENT OF "THE BASIS AND THE PURPOSE" FOR ITS REQUEST.

As the District Court correctly found, DOJ failed to comply with Title III's requirement that it provide a "demand in writing" that "shall

[14] For similar reasons, any argument that Secretary Oliver "comes into . . . possession" of the SVRL from one of her subordinates is also unpersuasive. The SVRL is a living, continuously updated document that many people access and update, a process that Secretary Oliver, who is sued in her official capacity, oversees. App. 207–10. In any event, this reading would impose Title III's preservation obligation on each individual employee of an elections office, "requiring officials to retain multiple copies of the same records and papers, on pain of fine or imprisonment." *Evans*, 2026 WL 2267774, at *10 n.8.

contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. DOJ's failure to do so provides multiple bases to affirm.

### A. The Federal Rules of Civil Procedure Apply.

As an initial matter, the Federal Rules of Civil Procedure govern this civil action, as the text of Title III does not create any special exception from the Federal Rules. *See id.* § 20705. DOJ claims that enforcing a Title III demand constitutes "a special statutory proceeding," such that the Federal Rules do not apply. DOJ Br. at 16–17. It further claims that courts may conduct no inquiry whatsoever into DOJ's compliance with Title III's "basis and purpose" requirements. Appellant is incorrect, as held by the district court and numerous other federal courts. App. 485.[15]

To begin, the Federal Rules themselves are explicit on this point. By their own terms, they "govern the procedure in *all* civil actions and

[15] *See Benson*, 179 F.4th at 483 n.2; *Bellows*, 834 F. Supp. 3d at 121–22; *Fontes*, 832 F. Supp. 3d at 947 & n.1; *Amore*, 831 F. Supp. 3d at 155-56; *Oregon*, 828 F. Supp. 3d at 1102–03; *Weber*, 816 F. Supp. 3d at 1182; *Griswold*, 2026 WL 2235374, at *3; *Matthews*, 2026 WL 2212877, at *2; *Caldwell*, 2026 WL 2186515, at *5; *Adams*, 2026 WL 2123871, at *3–4; *Koski*, 2026 WL 2032532, at *1 n.2; *Warner*, 2026 WL 2018877, at *2–4; *Bd. of Elections of N.Y.*, 2026 WL 1999921, at *6–7; *Scanlan*, 2026 WL 1864054, at *1 n.2; *DeMarinis*, 2026 WL 1780586, at *3.

proceedings in the United States district courts." Fed. R. Civ. P. 1 (emphasis added). The Rules contain limited and narrow carveouts to their own application, none of which include a claim under Title III. *See* Fed. R. Civ. P. 81(a).

The text of Title III comports with the text of the Rules. Title III provides: "The United States District Court for the district in which a demand is made pursuant to section 20703 of this title, or in which a record or paper so demanded is located, shall have jurisdiction *by appropriate process* to compel the production of such record or paper." 52 U.S.C. § 20705 (emphasis added). Because the statute does not specify any particularized process, the process that is "appropriate," particularly where the United States "voluntarily invoked the jurisdiction of the federal courts and began the usual litigation process," App. 485, is the Federal Rules of Civil Procedure.[16]

[16] The legislative history of Title III, while unnecessary to interpret its plain meaning, is consistent. As Senator Hruska explained: "[Section 305] is merely a restatement of court powers which now exist. . . . A formal court application, and any order which might flow from the court, would still remain unimpaired and without diminution." 106 Cong. Rec. S6,959 (daily ed. March 30, 1960). The CRA's "appropriate process" language was meant to confirm courts' unimpaired judicial oversight—not stymie it as DOJ suggests. 52 U.S.C. § 20705.

Binding precedent confirms this reading. In *United States v. Powell*, 379 U.S. 48 (1964), the Supreme Court held that proceedings to enforce a federal records statute—one written in terms materially identical to the CRA, with the same "by appropriate process" language—are governed by the Federal Rules, *id.* at 57–58 & n.18 (citing 26 U.S.C. § 7604(a)); *compare* 26 U.S.C. § 7604(a) ("[T]he United States district court for the district in which such person resides or is found *shall have jurisdiction by appropriate process* to compel such attendance, testimony, or production of books, papers, records, or other data" (emphasis added)), *with* 52 U.S.C. § 20705 ("The United States district court for the district in which a demand is made . . . or in which a record or paper so demanded is located, *shall have jurisdiction by appropriate process* to compel the production of such record or paper" (emphasis added)). *Powell* could not have been any clearer on that jurisdictional provision's meaning: Because it provided that records requests would be judicially enforced "by appropriate process," and because no alternative process was specified, the Court squarely held that "*the Federal Rules of Civil Procedure apply*." 379 U.S. at 57–58 & n.18 (emphasis added). The legal and factual

sufficiency of the government's demand could be contested, as the Rules allow, on "any appropriate ground." *Id.* at 58. So too here.

Applying the Rules here is consistent with the independent judicial function that they are designed to serve. In the years since *Powell*, the Supreme Court and this Court have time and again reaffirmed that is stands for the principle that it is a court's responsibility to independently determine—prior to compelling disclosure—whether a government agency has followed procedural requirements, and whether the evidence sought is relevant and material to its investigation. *See, e.g.*, *Donaldson v. United States*, 400 U.S. 517, 528 (1971) ("The Civil Rules, of course, do have an application to a summons proceeding." (citing Fed. R. Civ. P. 81)); *Speidell v. United States*, 978 F.3d 731, 737–38 (10th Cir. 2020); *Standing Akimbo, LLC v. United States*, 955 F.3d 1146, 1155–56 (10th Cir. 2020). This independent judicial obligation is as important now as ever, where the United States invokes the jurisdiction of a federal court, by suing state officials to claim new authority over the administration of our elections.

DOJ argues that *Donaldson* undercuts *Powell*'s holding. DOJ Br. at 18–19 & n.3. But *Donaldson* merely indicates that—as with any case

governed by the Federal Rules—district courts retain the ability to tailor and streamline the procedural path a case takes, including by limiting the scope of any necessary discovery, provided that core protections, like scrutiny under Rule 12, are observed. *See* 400 U.S. at 528–29. DOJ here demands summary disposition and the transfer of voters' sensitive data, without any substantive review of its pleadings, let alone discovery; this would not allow for the "rights of the party summoned" to be "protected," or for any kind of "adversary hearing." *Id.* at 529.

For its argument that this action should be treated as a "special statutory proceeding," outside of the Federal Rules, DOJ is left to rely almost entirely on *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962), a half-century-old, pre-*Powell*, non-binding case addressing wholly dissimilar circumstances.

First and foremost, *Lynd* must be understood in context, as a response to the situation that prevailed in the Jim Crow South in the early 1960s. Title III's purpose was to protect the right to vote by facilitating antidiscrimination suits against counties that refused to process the voter registrations of Black voters and stymied every effort to enforce federal law. The Fifth Circuit painted a clear picture of this

recalcitrance: By the time *Lynd* was decided, the county registrar defendants in that case had already spent 18 months filing "a series of motions, motions to dismiss, opposing substitution motions for more definite statement and briefs and repeated extended oral arguments thereon," all "with no clear-cut ruling, no indication that this interminable proceeding would ever come to an end, and certainly never an order for production." *Id.* at 227. This was all despite the fact that "the factual foundation for" the Attorney General's Title III requests was utterly self-evident—massive racial disparities in registration evidencing a discriminatory refusal to register Black voters—and DOJ had in fact clearly stated the factual basis and purpose of its requests to local registrars. *See id.* at 226–28 & n.6. Against that backdrop, the Fifth Circuit emphasized that, after months of dilatory action, a new round of plenary "judicial review or ascertainment" of facts was not warranted; to the contrary, the statutory goal of protecting the franchise could at that point only be met with summary resolution. *See id.* at 226–28.

Moreover, *Lynd* was decided before sensitive personal identifying information such as Social Security numbers or driver's license numbers was widely required as part of a person's voter registration record, and

before any federal laws had been passed to protect and constrain access to personal information. *See Weber*, 816 F. Supp. 3d at 1183 ("[D]river's license numbers and partial social security numbers were not required for voter registration until the passage of HAVA in 2002 so Congress could not have conceived for this highly sensitive information to be at the DOJ's disposal through the passage of Title III four decades prior."). *Lynd* and contemporaneous cases drew a line between "confidential, private papers and effects" and "*public* records which ought ordinarily to be open to legitimate reasonable inspection." 306 F.2d at 231. And even in that very different context, federal courts applying Title III recognized there would be "exception[s]" to "[t]he right of free examination of official records" due to improper purpose. *In re Coleman*, 208 F. Supp. at 201.

DOJ's behavior here is fundamentally different than its behavior in *Lynd*: There, it sought expedited summary judgment following months of litigation over a facially valid Title III demand—something that the Federal Rules would certainly allow under appropriate circumstances, *see* Fed. R. Civ. P. 16(b), 56. *Lynd* is thus inapposite.

DOJ argues that Title III prevents federal courts from any inquiry into whether a federal demand for hundreds of thousands of voters'

personal identifying information is legally valid, even where the federal government invoked the court's jurisdiction by filing a civil action. No wonder so many courts have rejected this claim: Title III's text, binding cases like *Powell* and its progeny, the Rules themselves, and basic notions of due process and judicial independence are all to the contrary.

### B. The United States Failed to Comply with the CRA's Basis and Purpose Requirements.

Whatever form the inquiry takes, Title III's statutory requirements must be met; otherwise, DOJ's demand is fatally flawed and cannot be enforced.[17] That is the case here.

A Title III demand requires a written "statement of the basis and the purpose" for the records the Attorney General is seeking. 52 U.S.C. § 20703. Title III's "basis" and "purpose" requirements are critical safeguards created precisely to prevent the statute from becoming a vehicle for DOJ to conduct baseless fishing expeditions and to provide proper notice to election officials of the nature of the federal government's

---

[17] In the end, whether the Rule 12 standard or some other standard applies here does not change the outcome in this appeal. App. 486 n.17. (holding that the Federal Rules apply but finding that "[w]ere the Court to conclude otherwise, its analysis of the dispositive issue" in the case "would be the same"); *accord Amore*, 831 F. Supp. 3d at 157 n.3; *Galvin*, 830 F. Supp. 3d at 125 n.3.

inquiry. *See* 106 Cong. Rec. H5,326 (daily ed. March 11, 1960) (enacted statutory language introduced to prevent "fishing expedition[s]"). Those safeguards are consistent with the application of other federal statutes allowing federal agencies to obtain records in service of investigations, which are enforceable if, among other things, the underlying investigation has a proper purpose and there is an actual nexus between that purpose and the specific information sought. *See EEOC v. Burlington N. Santa Fe R.R.*, 669 F.3d 1154, 1157 (10th Cir. 2012) (declining to enforce administrative subpoena where agency sought nationwide information without allegations of nationwide impropriety); *EEOC v. TriCore Reference Lab'ys*, 849 F.3d 929, 937 (10th Cir. 2017) (an agency "must show it has a realistic expectation rather than an idle hope that the information requested will advance its investigation" (quotation marks omitted)).

The requirement that the basis and the purpose be provided "in writing," means that the basis and the purpose "must be made express." *Galvin*, 830 F. Supp. 3d at 128. In this way, "[t]he statute . . . directs the Court to the Attorney General's written demand—rather than the United States's subsequent court filings—to determine whether that demand"

satisfies the basis and purpose requirements. *Id.* In addition, the statute's language, providing that the demand "contain a statement of *the* basis and *the* purpose therefor," confirms that "basis" and "purpose" are two "conceptually distinct" and independent requirements. *Id.* (emphasis added); *see* 52 U.S.C. § 20703; *see also Benson*, 179 F.4th at 483. And by twice using the definite article, the statute requires not just a conceivable or possible basis or a purpose, but *the* complete basis and *the* complete purpose underlying the request. *See Niz-Chavez v. Garland*, 593 U.S. 155, 165–66 (2021) (noting that the inclusion of a definite article with a singular noun implies that each noun is "a discrete thing"); *see also, e.g.*, *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 817 (2024).

The "basis" is the factual grounds for why the Attorney General believes there may be a violation of federal civil rights law in the first place, whereas the "purpose" explains how the requested records would help the Attorney General determine if there is, in fact, a violation. In *Lynd*, for example, the Attorney General's stated *basis* was "information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to

registration and voting within [the] jurisdiction." 306 F.2d at 229 n.6. The stated *purpose* was "to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred," i.e., to investigate and establish a discriminatory "pattern or practice" in the jurisdiction's voting registration processes. *Id.*; *see also id.* at 228 n.4.

DOJ resists this commonsense interpretation by claiming that both prongs of the basis-and-purpose requirement are satisfied when DOJ states that its demand was made to investigate "possible violations of a Federal statute"—without specifying anything about what those violations might be or how the requested records would aid in investigating. DOJ Br. at 21 (quoting *Coleman*, 313 F.2d at 868). This is atextual, as Title III refers to "the basis and the purpose," clarifying that they refer to two distinct concepts. It also defies the statutory structure: the basis-and-purpose requirement exists to prevent fishing expeditions, but it is hard to see how a district court reviewing a document demand, *see* 52 U.S.C. § 20705, could determine whether to grant enforcement based solely on such a conclusory statement. Plainly, the statute requires more.

### C. The United States Failed to Provide an Adequate Basis.

The "basis" for a CRA demand is a statement of why the United States believes there may be some relevant violation of law—the "information" that the demand is "based upon." *Lynd*, 306 F.2d at 229 n.6; *see also Basis*, Merriam-Webster, https://www.merriam-webster.com/dictionary/basis (last visited Apr. 16, 2026) ("something on which something else is established or based"). Recent federal court decisions have thus consistently held that "the 'basis' contemplated by Title III is a factual, not legal basis." *Warner*, 2026 WL 2018877, at *5; *see also, e.g.*, *Galvin*, 830 F. Supp. 3d at 128–30; *Oregon*, 828 F. Supp. 3d at 1103; *Weber*, 816 F. Supp. 3d at 1184; *Matthews*, 2026 WL 2212877, at *5; *Scanlan*, 2026 WL 1864054, at *7.

DOJ claims, in passing, that the basis requirement refers to the legal basis for the request (i.e., Title III), rather than the factual one. DOJ Br. at 21. But this is tautological: any request under Title III would necessarily satisfy the basis requirement, rendering it surplusage. *See Chevron Mining Inc. v. United States*, 863 F.3d 1261, 1283 n.15 (10th Cir. 2017) ("The canon against surplusage indicates that we generally must give effect to all statutory provisions, so that no part will be inoperative

or superfluous—each phrase must have distinct meaning.”). To the extent DOJ argues the NVRA or HAVA provide a sufficient basis, *see* DOJ Br. at 23, this fails for similar reasons: the mere existence of some other federal law does not provide basis for this specific document request. A factual, not a legal, basis is required.

Here, the United States has consistently failed to provide *any* factual basis. The Complaint does not allege that any factual basis for the demand was ever stated, *see* App.23–25 ¶¶ 18–29, and the September 8 letter in which DOJ actually made its demand is similarly silent as to why (or even if) the United States believes New Mexico’s list maintenance procedures might violate the NVRA or HAVA, *see* App. 50–52. It does not use words like “basis” or “based upon” or otherwise refer to the factual grounds for the request. There is simply no statement of any factual basis whatsoever. The total omission of any factual basis for the demand is fatal, as the district court (and numerous others) correctly concluded. App. 490–91; *accord Amore*, 831 F. Supp. 3d at 157; *Galvin*, 830 F. Supp. 3d at 128–30; *Oregon*, 828 F. Supp. 3d at 1103; *Weber*, 816 F. Supp. 3d at 1184; *Warner*, 2026 WL 2389778, at *5; *Matthews*, 2026 WL 2212877, at *5; *Scanlan*, 2026 WL 1864054, at *7.

The United States notes that the September 8 Letter "[i]nvok[ed] the NVRA and HAVA"—and claims that this was sufficient to "ma[k]e clear that the basis for its written demand was those statutes and New Mexico's possible noncompliance with their list-maintenance requirements." DOJ Br. at 23. But the September 8 Letter provides no details at all about this "possible noncompliance," raised only by implication. It is unclear what facts, if any, indicate any potential NVRA or HAVA violations in New Mexico's voter list maintenance practices. It is unclear what aspects of the state's voter list maintenance practices are or might be at issue. And it is unclear what reason—literally any reason at all—DOJ has to think that there might be a violation of any statute occurring. DOJ's unadorned statement that it wishes to "ascertain New Mexico's compliance with the list maintenance requirements of the NVRA and HAVA," DOJ Br. at 8, does not shed light on these questions. It does not provide any factual foundation—that is, any *basis*—to investigate anything.

Recognizing as much, the United States claims it may "investigate merely on suspicion that the law is being violated," or even because it "want[s] assurance that it is not." *Id.* at 24–25. This does nothing to help

its position, because nothing about the September 8 Letter suggests any actual suspicion with respect to New Mexico's list maintenance procedures that requires further investigation or assurance. Indeed, the United States' examples of other civil-rights investigative tools prove this point: those compliance reviews are triggered by "a complaint of a violation of federal law." *Id.* at 25 n.5. The September 8 Letter does not even contain that.

In search of a factual basis, the United States also notes that the Complaint (not the September 8 Letter) "explained . . . the Attorney General sent the September 8 Letter based on a review of the 2024 [Election Administration and Voting Survey (EAVS)] Report." DOJ Br. at 23; App. 23 ¶ 18. But this Court must look to "the Attorney General's written demand—rather than the United States' subsequent court filings—to determine whether that demand contained a statement of the basis." *Galvin*, 830 F. Supp. 3d at 128 (quotation marks omitted). That letter—not any unexpressed motivations or post hoc rationalizations—must satisfy Title III. Because the September 8 Letter contains no factual allegations of any impropriety or irregularities in New Mexico's election administration, it does not. Nor, in any event, does the EAVS data

provide any factual basis for the request. In its briefing (and, of course, in the September 8 Letter) DOJ does not explain what the 2024 EAVS data revealed or how it bears on New Mexico's compliance with list maintenance provisions of federal law. The mere fact that DOJ reviewed the 2024 EAVS Report does not cure the September 8 Letter's deficiency.

It is not supposed to be this way. *Lynd*, DOJ's chief authority, *e.g.*, DOJ Br. at 21–23, shows exactly how the statute was designed to work—and how straightforward it is when enforced in good faith. The Attorney General's written demand to the Southern registrars in that case was short—"[t]his demand is based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within [the] jurisdiction"—but, especially in context, made clear "the basis" to support a potential violation of law, and thereby provided the requisite notice that was due on this score. 306 F.2d at 229 n.6. Title III's "basis" requirement, which was specifically designed to prevent pure fishing expeditions like the one here, mandates no more but also no less.

### D. The United States Failed to Provide a Valid Purpose.

While "the basis" refers to the factual foundation for believing there might be some violation of law, the statutorily required "purpose" is an explanation of how the requested records would help "ascertain whether or not violations of Federal law . . . have occurred." *E.g.*, *Lynd*, 306 F.2d at 229 n.6. Title III requires an "assessment of the sufficiency of . . . the purpose asserted," *Bellows*, 834 F. Supp. 3d at 124; otherwise, "[i]f any purpose . . . would suffice, then the requirement of stating the demand's purpose would serve no function," *Oregon*, 828 F. Supp. 3d at 1104.

Here, DOJ's September 8 letter stated that "[t]he purpose of the request is to ascertain New Mexico's compliance with the list maintenance requirements of the NVRA and HAVA." App. 51. At least eight federal courts have held that this or a substantially similar purpose did not satisfy Title III in a request for states' SVRLs. *See Bellows*, 834 F. Supp. 3d at 122; *Schmidt*, 835 F. Supp. 3d at 700; *Amore*, 831 F. Supp. 3d at 157–58; *Oregon*, 828 F. Supp. 3d at 1104–05; *Weber*, 816 F. Supp. 3d at 1183–84; *Griswold*, 2026 WL 2235374, at *4; *Matthews*, 2026 WL 2212877, at *5–6; *Warner*, 2026 WL 2018877, at *6–8. Here too, for multiple reasons, DOJ's stated purpose is invalid.

*First*, DOJ's stated purpose is outside the scope of Title III. The CRA and Title III were not designed to compel list maintenance, but rather to investigate "violations of individuals' voting rights." *See Oregon*, 828 F. Supp. 3d at 1105; *accord Amore*, 831 F. Supp. 3d at 157–58; *Weber*, 816 F. Supp. 3d at 1183. Its purpose was to "help end voting discrimination." *Benson*, 179 F.4th at 474. Accordingly, the purpose of a Title III demand must involve "an investigation into potential violations of an individual's right to vote." *Warner*, 2026 WL 2018877, at *7; *accord Amore*, 831 F. Supp. 3d at 157–58; *Oregon*, 828 F. Supp. 3d at 1105; *Matthews*, 2026 WL 2212877, at *5.

DOJ argues that enforcing federal law—*any* federal law—is a proper purpose for a request under Title III. DOJ Br. at 27–28. This ignores not just the widespread, notorious discrimination in voting that the CRA was enacted to help remedy, but the election-specific focus of Title III itself. *See* 52 U.S.C. § 20701 (imposing preservation obligation on "[e]very officer of election" for records they obtain "relating to an act requisite to voting" for a period of time set with reference to federal elections).

DOJ alternatively argues that its putative purpose to investigate New Mexico's list maintenance practices vindicates the right to vote. *See* DOJ Br. at 28–29. It is true that list maintenance procedures may potentially implicate individuals' right to vote, that is, the right of eligible voters to cast a ballot that will be counted—for example, in the case of improper removal of voters close to an election, or without proper safeguards, in violation of the NVRA. *See* 52 U.S.C. § 20507(d). But in the next breath, DOJ clarifies that its demand is justified by speculation about the impact of "invalid votes." DOJ Br. at 29. This speculation comes unaccompanied by a shred of allegation or evidence that any such votes have been or will be cast in New Mexico, and the September 8 Letter—the operative document—does not explain or even mention this purpose. Even if properly presented and supported, a fishing expedition to find improperly-cast ballots does nothing to advance the voting rights of New Mexicans and thus "lack[s] any reference or relation to the purposes for which Title III was enacted." *Oregon*, 828 F. Supp. 3d at 1105.

*Second*, DOJ's stated purpose does not comport with the records it demands. Neither the September 8 letter nor the Complaint articulate how the unredacted SVRL, which is a static snapshot of New Mexico's

voter file, is necessary or even relevant to ascertaining the state's compliance with the NVRA or HAVA. App. 19–26, 50–52. In fact, it is not.

The NVRA requires states to "conduct a general program that makes a reasonable effort" to remove ineligible voters from the official lists of eligible voters. 52 U.S.C. § 20507(a)(4)(A)–(B). Perfect or error-free voter rolls are not the standard, nor are they feasible in practice. *See, e.g.*, *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 624–26 (6th Cir. 2025) (describing a "reasonable effort" as "a serious attempt that is rational and sensible" and rejecting any "quantifiable, objective standard" in this context), *cert denied* 146 S. Ct. 1772 (2026).[18] Instead, the NVRA explicitly *prohibits* removal of the names of some potentially ineligible registrants from the official list of eligible voters until steps are taken to provide notice and ensure they are not removed prematurely or unfairly.[19]

---

[18] *See* U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report* 150 (2025), *available at* https://www.eac.gov/sites/default/files/2025-07/2024_EAVS_Report_508.pdf (noting it is "inevitable" that voter lists will contain some voter records for individuals who are no longer eligible to vote).

[19] Section 8(d) of the NVRA sets out a specific set of rules and requirements for removals from the voter rolls based on changes of residence, whereby states "shall not remove" voters on these grounds

Meanwhile, HAVA, which requires the collection and use of personal identifying information and numerical identifiers in the state's SVRL, makes clear that it is *states*—not the federal government—that are principally tasked with "perform[ing] list maintenance." 52 U.S.C. § 21083(a)(2)(A). That statute expressly provides that "[t]he specific choices on the methods of complying with" such requirements "shall be left to the discretion of the State." *Id.* § 21085.

Accordingly, it is a state's *overall procedures* for voter list maintenance and how they are carried out that establish its compliance with the NVRA and HAVA. *See* 52 U.S.C. §§ 20507(a)(4), (c)(1), 21083(a)(2)(A), 21085; *see also Pub. Int. Legal Found. v. Benson*, 136 F.4th at 624–26; *Oregon*, 828 F. Supp. 3d at 1097; *Bellows*, 834 F. Supp. 3d at 124–25; *Matthews*, 2026 WL 2212877, at *1. A snapshot of the unredacted voter file (much less the highly sensitive personal identifiers like driver's license and partial Social Security numbers contained therein) does not; it simply cannot provide the information to determine if the state has made a "reasonable effort" to remove ineligible voters or

---

unless these voters directly confirm their change of residence in writing, or unless states first provide notice and then abide by a multi-year statutory waiting period. 52 U.S.C. § 20507(d).

is otherwise in compliance with the NVRA or HAVA. DOJ's suggestion that it needs the unredacted SVRL to identify duplicate registrations or voters who are ineligible to register, *see* DOJ Br. at 32, entirely ignores the standards that the NVRA and HAVA actually impose on states and the protections they create for voters.

DOJ never meaningfully contests this. It discusses the ID provisions of HAVA in its brief, DOJ Br. at 32, but omits mention of HAVA's express limitation on the role of the federal government in superintending states' methods of compliance with those provisions. 52 U.S.C. § 21085. It claims that the SVRL will allow it to determine whether New Mexico is assigning unique HAVA identifiers to voters, DOJ Br. at 32, but a massive digital trove of sensitive personal identifying information is not necessary or relevant for that purpose. DOJ could simply review a redacted SVRL that would indicate any blank spaces in the ID number fields.

*Third*, DOJ's stated purpose is contradicted by the United States's own public statements, which prove its stated motives are pretextual—and thus that it has not provided "a statement of . . . the purpose" for its request. 52 U.S.C. § 20703.

The United States has filed over thirty nearly-identical lawsuits demanding states' complete unredacted SVRLs, including sensitive personally identifiable information. *See supra* Statement of the Case, Section B. The statements and documents in the public record reveal the current administration's intentions: "[T]o create a nationwide voter-database, for potential weaponization in future elections; as a 'fishing expedition,' hoped to advance unsubstantiated claims of non-citizen voting; and as a tool for immigration enforcement." *Schmidt*, 835 F. Supp. 3d at 699–700; *see also Weber*, 816 F. Supp. 3d at 1184; *Oregon*, 828 F. Supp. 3d at 1106, 1108. Yet the United States has repeatedly invoked only voter list maintenance as the stated purpose for its nationwide effort to seize states' voter rolls.

The concern that DOJ has not disclosed the true and complete purpose or purposes of its demands for state voter roll data as required by Title III is particularly acute in light of the MOU that the United States has asked states to sign in connection with its SVRL requests. *See* App. 70–78. Far from indicating a purpose of ensuring compliance with the NVRA and HAVA, the MOU runs directly afoul of those statutes. For example, the MOU purports to allow DOJ to compel states to remove

supposedly ineligible voters "within forty-five (45) days." App. 74. This would violate multiple protections of the NVRA, including its notice requirements prior to removing voters from the rolls and its bar against systematic voter removals in the so-called "quiet period," that is, the ninety days prior to a federal election. *See* 52 U.S.C. § 20507.

As if to underscore the irregular nature of its request, the United States has requested this Court to issue a decision immediately, to "allow the United States to work with New Mexico to take real steps to clean up its SVRL, if necessary," prior to the November 3, 2026, elections. DOJ Br. at 44. As with the MOU, this would be unlawful: the quiet period—which has already begun for the November elections—bars any program aimed at the systematic removal of registered voters. 52 U.S.C. § 20507(c).

The Court need not ignore public information demonstrating DOJ's failure to provide a statement of the actual purpose for its demand. It is not "required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). It "is not obliged to accept a contrived statement and purpose" in place of an accurate one. *Weber*, 816 F. Supp. 3d at 1184, 1186; *accord Oregon*, 828 F. Supp. 3d at 1106–08; *Schmidt*, 835 F. Supp. 3d at 699–700; *Warner*, 2026 WL

2018877, at *8 n.9. DOJ was required to state, in writing, "*the* purpose" for its demand. 52 U.S.C. § 20703; *see Niz-Chavez*, 593 U.S. at 165–66. The pleadings and public record show that it did not.

## III. THE CRA DOES NOT REQUIRE DISCLOSURE OF SENSITIVE VOTER INFORMATION TO THE FEDERAL GOVERNMENT.

Even if the United States had provided a valid basis and purpose in support of a demand for records covered by Title III—which it did not—any sensitive personal voter information must be subject to redaction. Constitutional and privacy concerns prohibit disclosure of the sensitive information that the United States seeks, because requiring voters to consent to the disclosure of their uniquely sensitive information, like driver's license numbers and other unique identifier numbers, as a prerequisite to voting creates an unnecessary burden on their fundamental right to vote. *See Greidinger v. Davis*, 988 F.2d 1344, 1355 (4th Cir. 1993) (holding that making disclosure of sensitive data "a condition of [the] right to vote . . . creates an intolerable burden on that right . . . .").

New Mexicans would be discouraged from registering and exercising their right to vote if the sensitive information they submitted

for registration could be seized by the federal executive without an opportunity to object. *See, e.g.*, App. 59–60, 63–64, 67–68. This risk of chilling voters' rights is especially serious here, where the United States has admitted to sharing sensitive personal information with outside activist groups and storing such data on unsecured, non-government servers that did not conform with agency security protocols. *See AFSCME* Notice at 5–6.

In *Lynd*, the Fifth Circuit noted that "of great importance" to its reasoning was that it was "not discussing confidential, private papers and effects" but "rather dealing with public records which ought ordinarily to be open to legitimate reasonable inspection." 306 F.2d at 231. But here, DOJ rejected New Mexico's offer to provide public records, and instead seeks sensitive private information like driver's license numbers and partial Social Security numbers. Federal laws enacted since *Lynd* was decided acknowledges the sensitivity of such personal data in multiple ways. *See, e.g.*, 5 U.S.C. § 552(b)(6) (exempting private records from FOIA disclosure); 5 U.S.C. § 552a(b) (establishing protections for personal information held by the federal government). And today, unlike when *Lynd* was decided, there are new threats: Voter data can be

electronically transferred, compounded, hacked, or run through dodgy, DOGE-run AI programs.

Courts' treatment of requests for state voter rolls under the NVRA is instructive. The NVRA includes a records provision allowing for disclosure of records specifically related to list maintenance. *See* 52 U.S.C. § 20507(i)(1). This Court and others have recognized that this provision permits states to "redact appropriate personal information before providing the voter data." *Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1083 n.14 (10th Cir. 2025); *accord Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024); *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 334, 339 (4th Cir. 2012); *Pub. Int. Legal Found., Inc. v. N. Carolina State Bd. of Elections*, 996 F.3d 257, 264 (4th Cir. 2021). Interpreting the NVRA to allow for such redactions thus helps prevent any conflict between the NVRA's disclosure provisions and voters' constitutional rights and thereby "avoid[s] serious constitutional doubts." *Pino v. Oliver*, No. 25-2016, 2026 WL 2318219, at *7 n.7 (10th Cir. 2026) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009)).

Title III should be interpreted consistently with the later-enacted NVRA to allow and even require redactions to protect privacy and the right to vote. Both statutes use the same "all records" language.[20] And both statutes are silent as to how sensitive personal information should be treated during disclosure. *See* 52 U.S.C. §§ 20703; 52 U.S.C. § 20507(i)(1).

DOJ resists this approach, arguing that the NVRA's disclosure provisions are available to all, whereas the CRA applies only to the federal government. DOJ Br. 33–34. But invasions of privacy by the federal government are no less chilling than those wrought by private actors—indeed, some would undoubtedly find the federal intrusions *more* problematic. Moreover, the limited case law considering records requests under the CRA from around the time of the statute's passage expressly acknowledged that courts retain the "power and duty to issue protective

---

[20] *Compare* 52 U.S.C. § 20507(i) ("Each State shall maintain for at least 2 years and shall make available for public inspection . . . *all records* concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters") (emphasis added), *with* 52 U.S.C. § 20701 ("Every officer of election shall retain and preserve, for a period of twenty-two months . . . *all records* and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election . . . .") (emphasis added).

orders," *Lynd*, 306 F.2d at 230; *accord In re Coleman*, 208 F. Supp. at 200, recognizing that, even in the CRA context, courts can and must protect sensitive voter information from disclosure where privacy and constitutional concerns arise. *See, e.g.*, *Pub. Int. Legal Found. v. Bellows*, 92 F.4th at 56; *Long*, 682 F.3d at 339.[21]

Even if the United States had properly pleaded some entitlement to New Mexico's SVRL under Title III, voters' sensitive personal information would still need to be protected. Because DOJ demands only an unredacted SVRL containing sensitive personal identifying information that cannot be disclosed without intruding on voters' constitutional rights, its demand is defective and the Court can affirm on that basis as well.

[21] New Mexico voters have an extremely strong interest in the privacy of their personal identifying information, as evidenced by the protections for such information in state law. *See, e.g.,* N.M. Stat. Ann. §§ 1-4-5.5, 1-4-5.6. These state laws are relevant not because Intervenor Defendants-Appellees are arguing that they somehow trump federal law, as DOJ wrongly suggests, DOJ Br. at 42–43, but because they help define the strong privacy interest of New Mexico voters.

## CONCLUSION

For all the foregoing reasons, this Court should affirm the judgment below.

Dated: September 16, 2026

Respectfully submitted,

*/s/William Hughes*

William Hughes
Theresa J. Lee
Ethan Herenstein
Sophia Lin Lakin
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549 – 2500

María Martínez Sánchez
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NEW MEXICO
P.O. Box 566
Albuquerque, NM 87103

## STATEMENT REGARDING ORAL ARGUMENT

Intervenor Defendants-Appellees Common Cause, Claudia Medina, and Justin Allen respectfully request that they be allowed to present oral argument, given the importance of this case and the legal questions at issue. Intervenor Defendants-Appellees disagree with the United States that expedited consideration of this case is necessary or warranted, and oppose any oral argument being scheduled in September 2026.

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). The brief contains 12,276 words, excluding those parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Tenth Circuit Rule 32(B). This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) and Tenth Circuit Rule 32(A) because this brief has been prepared using Microsoft Word in Century Schoolbook, a proportionally spaced typeface, in 14-point font.

Date: September 16, 2026 *_/s/William Hughes_*
William Hughes

## CERTIFICATE OF COMPLIANCE WITH CM/ECF USER'S MANUAL

I hereby certify that no privacy redactions were required as outlined in the CM/ECF User's Manual. I further certify that any hard copies of this brief, if ordered by the Court, will be exact copies of the electronic filing.

## CERTIFICATE OF SERVICE

I certify that on September 17, 2026, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Tenth Circuit using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished with the CM/ECF system.

Date: September 17, 2026 *_/s/William Hughes_*

William Hughes