**No. 26-2126**

**IN THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT**

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

MAGGIE TOULOUSE OLIVER, in her official capacity as Secretary of State of New Mexico,

*Defendant-Appellee,*

NEW MEXICO ALLIANCE FOR RETIRED AMERICANS; COMMON CAUSE; CLAUDIA MEDINA; JUSTIN ALLEN,

*Intervenors-Defendants-Appellees.*

On Appeal from the U.S. District Court for the District of New Mexico
No. 1:25-cv-1193-JCH-JFR (Hon. Judith C. Herrera)

# BRIEF OF *AMICI CURIAE* CAMPAIGN LEGAL CENTER AND BRENNAN CENTER FOR JUSTICE IN SUPPORT OF APPELLEES AND URGING AFFIRMANCE

Maura Eileen O'Connor*
Justin Lam*
BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW
777 6th St., NW, Suite 1100
Washington, DC 20001
(202) 249-7190
oconnore@brennan.law.nyu.edu

Katherine Hamilton
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, DC 20005
(202) 736-2200
khamilton@campaignlegalcenter.org

*Counsel for Amici Curiae*
**Admission pending*

## TABLE OF CONTENTS

TABLE OF CONTENTS .......... ii

TABLE OF AUTHORITIES .......... iii

STATEMENT OF INTEREST OF *AMICI CURIAE* .......... 1

INTRODUCTION .......... 2

BACKGROUND .......... 4

SUMMARY OF ARGUMENT .......... 6

ARGUMENT .......... 6

I. The district court correctly found that Appellant failed to state a basis for its demand. .......... 7

A. The CRA requires Appellant's demand to contain separate statements of the factual "basis" and the legal "purpose." .......... 7

B. Appellant's demand for New Mexico's unredacted SVRL lacked a statement of basis .......... 10

II. Appellant fails to state a legitimate purpose under the CRA. .......... 12

A. Appellant's stated list-maintenance purpose does not fulfill the "purpose" requirement of the CRA. .......... 12

B. Appellant's statement of purpose is pretextual .......... 17

III. Appellant's demand undermines authority over elections that the Constitution reserves for Congress and the States. .......... 25

CONCLUSION .......... 30

CERTIFICATE OF COMPLIANCE .......... 31

CERTIFICATE OF SERVICE .......... 32

# TABLE OF AUTHORITIES

## Cases

*California v. Trump*, 786 F. Supp. 3d 359 (D. Mass. 2025) .................... 26

*California v. Trump*, No. 25-cv-10810-DJC, 2026 WL 1826535 (D. Mass. June 24, 2026) .................... 28

*California v. U.S. Dep't of Health & Hum. Servs.*, No. 25-cv-05536, 2025 WL 3751931 (N.D. Cal. Dec. 29, 2025) .................... 24

*Cmty. Econ. Dev. Ctr. of Se. Mass. v. Bessent,* 818 F. Supp. 3d 228 (D. Mass. 2026) .................... 23

*Ctr. for Taxpayer Rts. v. Internal Revenue Serv.,* 815 F. Supp. 3d 1, (D.D.C. 2025) .................... 23

*Ctr. for Taxpayer Rts. v. Internal Revenue Serv.*, No. 25-0457, 2026 WL 551105 (D.D.C. Feb. 26, 2026) .................... 23

*Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42 (2024) .................... 14

*Dep't of Com. v. New York*, 588 U.S. 752 (2019) .................... 18

*DSCC v. Trump*, No. 26-5193, 2026 WL 2168617 (D.C. Cir. July 28, 2026) .................... 26

*Fischer v. United States*, 603 U.S. 480 (2024) .................... 8

*In re Church of Jesus Christ of Latter-Day Saints Tithing Litig.*, No. 25-4068, 2026 WL 2561896 (10th Cir. Aug. 31, 2026) .................... 18

*In re Gordon*, 218 F. Supp. 826 (S.D. Miss. 1963) ................................ 10

*Johnson v. Barr*, 967 F.3d 1103 (10th Cir. 2020) ................................ 8, 15

*Kennedy v. Bruce*, 298 F.2d 860 (5th Cir. 1962) ................................ 9, 11

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) ................................ 11

*League of United Latin Am. Citizens v. Exec. Off. of the President*, 808 F. Supp. 3d 29 (D.D.C. 2025) (*LULAC I*) ................................ 2, 26

*League of United Latin Am. Citizens v. Exec. Off. of the President*, 818 F. Supp. 3d 34 (D.D.C. 2026) (*LULAC II*) ................................ 25, 27

*League of Women Voters v. U.S. Dep't of Homeland Sec.*, 835 F. Supp. 3d 79 (D.D.C. 2026) ................................ 20, 22

League of Women Voters v. U.S. Dep't of Homeland Sec., No. 26-5243, 2026 WL 2643439 (D.C. Cir. Sep. 4, 2026) ................................ 20

*Smiley v. Holm*, 285 U.S. 355 (1932) ................................ 2

*Snow v. Powell*, 189 F.2d 172 (10th Cir. 1951) ................................ 8

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) ................................ 13

*U.S. Postal Serv. v. California*, No. 26A305, slip. op. (Sept. 14, 2026) .. 28

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988) ................................ 13

*United States v. Amore*, 831 F. Supp. 3d 149 (D.R.I. 2026) . 10, 12, 17, 19

*United States v. Bellows*, 834 F. Supp. 3d 113 (D. Me. 2026) ................ 14

*United States v. Benson*, 179 F.4th 470 (6th Cir. 2026) ..................... 8, 13

*United States v. Benson*, No. 26-1225, 2026 WL 2364306 (6th Cir. Aug. 14, 2026) ................................................................................ 20

*United States v. Galvin*, 830 F. Supp. 3d 122 (D. Mass. 2026) .... 9, 10, 11

*United States v. Gradwell*, 243 U.S. 476 (1917) ..................................... 2

*United States v. Matthews*, No. 25-cv-3398, 2026 WL 2212877 (C.D. Ill. July 31, 2026) ........................................................... 10, 14, 16, 17

*United States v. Oregon*, 828 F. Supp. 3d 1092 (D. Or. 2026)..... 3, 10, 12, 14, 17, 18, 19

*United States v. Scanlan*, No. 25-cv-371, 2026 WL 1864054 (D.N.H. June 29, 2026) ................................................................... 8, 10

*United States v. Schmidt*, 835 F. Supp. 3d 697 (W.D. Pa. 2026) 10, 19, 29

*United States v. Stanchich*, 550 F.2d 1294 (2d Cir. 1977)...................... 18

*United States v. Warner*, No. 2:26-cv-00156, 2026 WL 2018877 (S.D. W. Va. July 13, 2026)............................................................ 12

*United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026) .... 3, 9, 10, 11, 16, 18, 19, 29

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014).................................. 13

*Williams v. Taylor*, 529 U.S. 362 (2000) .................................................8

**Statutes**

52 U.S.C. § 20507 ...................................................................15

52 U.S.C. § 20703 ......................................................6, 7, 14, 24

52 U.S.C. § 21083 ...............................................................14, 15

52 U.S.C. § 21085 ...................................................................15

52 U.S.C. § 21111 ...................................................................15

**Other Authorities**

*Basis*, Black's Law Dictionary (12th ed. 2024) ................................10, 23

Debate in Massachusetts Ratifying Convention, *in* 2 The Founders' Constitution 255 (Philip B. Kurland & Ralph Lerner eds., 1987)......................................................................26

Donald J. Trump (@realDonaldTrump), TruthSocial.com (Aug. 18, 2025)...................................................................28

Erica L. Green, Michael Gold & Robert Jimison, *Trump Repeats Call to 'Nationalize' Elections, as White House Walks It Back*, N.Y. Times (Feb. 3, 2026) ..................................................................28

Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (updated Sept. 23, 2026), https://www.brennancenter.org/our-work/research-reports/tracker-

justice-department-requests-voter-information [https://perma.cc/M89A-7MPN]. ........................................... 3, 4, 19

Kimberly Kindly and Amanda Seitz, *Trump administration gives personal data of immigrant Medicaid enrollees to deportation officials*, AP (June 14, 2025, at 1:52 p.m. ET) .............................. 24

Nicole Alvarez, *The Trump Administration Is Using Americans' Sensitive Data To Build a Digital Watchtower*, Ctr. for Am. Progress (Aug. 25, 2025) .............................................................. 25

Public Voter File Acquisition and Handling, SAM.gov (Aug. 25, 2026), https://sam.gov/workspace/contract/opp/c120b053872c4a6984773f8a413cacad/view.......................................................................... 21

Steven Portnoy et al., *Mullin Threatens to Withhold Aid From States That Don't Comply with DHS Election Directives*, ABC News (July 17, 2026, at 2:13 p.m. ET), https://abcnews.com/Politics/mullin-threatens-withhold-aid-states-dont-comply-dhs/story?id=134854708 [https://perma.cc/ZJ7E-DJBW] ............. 21

The Federalist No. 59 (Alexander Hamilton) ........................................ 26

**Constitutional Provisions**

U.S. Const. art. I, § 2 .............................................................. 25

U.S. Const. art. I, § 4 .............................................................. 2, 25

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

Campaign Legal Center (CLC) is a leading nonpartisan, nonprofit organization that has been working for more than 20 years to advance democracy through law. CLC engages in litigation, policy development, and advocacy to protect voting rights and ensure broad and equal access to the ballot.

The Brennan Center for Justice at New York University School of Law[2] is a nonprofit, nonpartisan think tank and public-interest law institute that seeks to improve systems of democracy and justice. Since its founding in 1995, the Brennan Center's work has focused extensively on protecting the right to vote using empirical, historical, and legal research. It participates in voting rights and election law cases around the country, both as counsel and *amicus curiae*.

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), *amici curiae* state that no party's counsel or person except *amici* and their counsel authored this brief or contributed money to fund its preparation or submission. All parties have consented to the filing of this brief pursuant to Fed. R. App. P. 29(a)(2).

[2] This brief does not purport to convey the position of New York University School of Law.

## INTRODUCTION

The Constitution delegates election administration primarily to the states, subject to regulation by Congress. *See* U.S. Const. art. I, § 4. The executive branch has a small role in elections and enjoys only the authority Congress grants it. *See League of United Latin Am. Citizens v. Exec. Off. of the President*, 808 F. Supp. 3d 29, 41–42 (D.D.C. 2025) (*LULAC I*) (permanently enjoining parts of the March 2025 executive order on elections). States' authority to administer their elections is broad, encompassing rules "not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Smiley v. Holm*, 285 U.S. 355, 366 (1932); *see also United States v. Gradwell*, 243 U.S. 476, 484 (1917) ("The policy of thus [e]ntrusting the conduct of elections to state laws, administered by state officers, which has prevailed from the foundation of the government to our day . . . was proposed by the makers of the Constitution, and was entered upon advisedly by the people who adopted it . . . .").

The U.S. Department of Justice (DOJ) seeks to upend the constitutional framework that governs elections by demanding full voter registration lists, including sensitive data like driver's license and partial social security numbers, from states like New Mexico. DOJ has demanded sensitive voter data from at least 48 states.[3] Most have refused. Appellant has sued election officials in New Mexico and 29 other states, plus the District of Columbia, over such refusals. Every court that has decided the issue—twenty-five district courts and one court of appeals—has ruled that states need not accede to DOJ's demands. Courts have concluded that DOJ's demands amount to an "overreach and misuse" of its role in election administration beyond constitutional limits. *United States v. Oregon*, 828 F. Supp. 3d 1092, 1108 (D. Or. 2026); *see also United States v. Weber*, 816 F. Supp. 3d 1168, 1195 (C.D. Cal. 2026) ("[T]he Executive may not unilaterally usurp the authority over elections . . . ."). And DOJ's desire to collect confidential voter information is not about enforcing federal voting statutes at all. Rather, those justifications

[3] Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (updated Sept. 23, 2026), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information [https://perma.cc/M89A-7MPN].

are pretext for DOJ to interfere with the state's role in elections and aggregate as much data about Americans as possible. Our constitutional system does not authorize DOJ to take those steps.

*Amici curiae* Brennan Center for Justice and Campaign Legal Center, two nonpartisan nonprofit organizations dedicated to solving challenges facing American democracy, submit this brief to explain how unprecedented demands from DOJ for sensitive voter data overstep the department's statutory authority and states' roles in administering elections—a trespass that upsets our constitutional structure surrounding elections. *Amici* urge this Court to affirm the decision of the district court dismissing the complaint.

**BACKGROUND**

On September 8, 2025, DOJ sent a letter to New Mexico Secretary of State Maggie Toulouse Oliver.[4] Citing the National Voter Registration Act of 1993 ("NVRA"), Help America Vote Act of 2002 ("HAVA"), and Title III of the Civil Rights Act of 1960 ("CRA"), the September 2025 letter

[4] As the district court noted, "[t]his was apparently the second letter the DOJ sent Toulouse Oliver," but neither that letter nor the Secretary's response were provided to the district court. *See* JA 474 n.1; *see also* Martinez-Ochoa, O'Connor & Berry, *supra* note 3 (detailing August 2025 DOJ request).

demanded an electronic copy of New Mexico's statewide voter registration list ("SVRL") that contained "*all fields*," including each voter's "date of birth, residential address, . . . driver's license number or the last four digits of the registrant's social security number." JA 50–52. DOJ stated that "[t]he purpose of this request is to ascertain New Mexico's compliance with the list maintenance requirements of the NVRA and HAVA." JA 51.

Two weeks later, Secretary Toulouse Oliver responded. She pledged to provide access to a "redacted voter file," and stated that under federal and state law, she was required to redact sensitive voter information. JA 54. She noted that DOJ's letter did not indicate that it was investigating New Mexico for any specific violations of the NVRA or HAVA, and that the fact that DOJ was seeking this information from all 50 states "undermines the assertion that this information is necessary to a specific investigation in New Mexico." JA 55.

Around two months later, Appellant sued. It alleged one claim: that the United States is entitled to the SVRL under the CRA. JA 25–26. Appellant also moved to compel the production of the unredacted SVRL. JA 28–32. The district court dismissed the complaint because DOJ's

demand letter lacked the "basis" for its request, as the CRA requires, and denied the Motion to Compel as moot. JA 491–92.

This appeal followed.

## SUMMARY OF ARGUMENT

This Court should affirm the decision of the district court dismissing the Complaint. The district court correctly held that Appellant failed to state the factual basis required under the CRA. The district court did not reach whether Appellant had satisfied the CRA's requirement that it state "the purpose" of its demand, but the demand fails on those grounds as well. This Court should look carefully at Appellant's unprecedented demand for the sensitive voting data of millions of Americans; the record in this case and similar cases across the country show that justifications for the requests are pretextual. And, if granted, Appellant's demand would undermine the constitutional separation of powers.

## ARGUMENT

The CRA requires that the Attorney General submit a "demand in writing" containing both the "basis" and the "purpose" of the demand. 52 U.S.C. § 20703. The district court correctly dismissed Appellant's

demand because its letter "lacks 'the basis' for the DOJ's records request." JA 491. The district court's holding on this point was correct and requires affirmance. This Court can also affirm based on another fatal flaw of Appellant's demand that the district court did not address. Appellant asserted a purpose that is both insufficient and pretextual. Appellant's demand, and similar demands it has made across the country, threatens to intrude into the list-maintenance responsibilities that Congress has reserved for the states.

## I. The district court correctly found that Appellant failed to state a basis for its demand.

The district court followed what the plain text of the CRA and decisions in parallel cases have made clear: The CRA requires Appellant to state a distinct, factual basis for its request. Appellant did not.

### A. The CRA requires Appellant's demand to contain separate statements of the factual "basis" and the legal "purpose."

The CRA requires that the Attorney General's "demand shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. These requirements underscore the CRA's respect for the constitutional separation of powers and why the district court correctly determined that Appellant's demand lacked a factual basis.

A demand under the CRA must contain separate statements of basis and purpose. A court must "give effect, if possible, to every clause and word of [the] statute." *Fischer v. United States*, 603 U.S. 480, 486 (2024) (quoting *Williams v. Taylor*, 529 U.S. 362, 404 (2000)). Both the inclusion of the article "the" before each of the words "basis" and "purpose" and the use of the conjunctive "and" between them show that the statute requires the statement to contain a specific basis and, separately, a specific purpose. *See Johnson v. Barr*, 967 F.3d 1103, 1110 (10th Cir. 2020) ("Use of the definite article 'the' refers to a specific noun."); *Snow v. Powell*, 189 F.2d 172, 174 (10th Cir. 1951) (statutory terms used in the conjunctive "should be given their full significance in order to carry out the intent and purpose of Congress").

Courts considering parallel cases have likewise concluded these are separate requirements. *See, e.g.*, *United States v. Benson*, 179 F.4th 470, 483 (6th Cir. 2026) ("The government cannot pinpoint a Title III demand with a statement of the basis *and* purpose. . . . [A]ny demand must contain both."); *United States v. Scanlan*, No. 25-cv-371, 2026 WL 1864054, at *6 (D.N.H. June 29, 2026) ("On its plain terms, this construction signals that 'basis' and 'purpose' are separate, non-

overlapping requirements, each of which must independently be satisfied."); JA 490 (quoting *Scanlan*). By contrast, allowing the Attorney General to "simply assert that he demands records for the purpose of investigating possible violations of federal law," Appellant Br. 22, would collapse those two requirements into one and thereby undermine Congress' decision to include both requirements. The statutory text does not support that reading.

Under the CRA, "basis" means a factual basis for the Attorney General's demand. *See Weber*, 816 F. Supp. 3d at 1182–84 ("The basis is the reasoning provided by the DOJ regarding the evidence behind its investigation of a particular state and specific, articulable facts pointing to the violation of federal law."); *United States v. Galvin*, 830 F. Supp. 3d 122, 127 (D. Mass. 2026) ("Put simply, the statute requires a statement of why the Attorney General demands production of the requested records—and, as conveyed by the statute's use of the definite article, the statement must be 'the' factual basis, not just a conceivable or possible basis."). At a minimum, the "basis" requirement compels DOJ to describe factual information in its possession that tends to show the law has been violated. *See Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962); *United*

*States v. Amore*, 831 F. Supp. 3d 149, 156–57 (D.R.I. 2026); *see also Basis*, Black's Law Dictionary (12th ed. 2024) ("an underlying fact or condition"). Every court to consider the issue has found the same. *See, e.g.*, *Amore*, 831 F. Supp. 3d at 156–57; *Galvin*, 830 F. Supp. 3d at 129–30; *Oregon*, 828 F. Supp. 3d at 1104; *Scanlan*, 2026 WL 1864054, at *7–8; *United States v. Schmidt*, 835 F. Supp. 3d 697, 698 (W.D. Pa. 2026); *United States v. Matthews*, No. 25-cv-3398, 2026 WL 2212877, at *5 (C.D. Ill. July 31, 2026).

The requirement that DOJ state a factual basis for a record demand is a meaningful safeguard that Appellant may not flout. *See Weber*, 816 F. Supp. 3d at 1184; *Oregon*, 828 F. Supp. 3d at 1103. It ensures that the federal government uses the CRA as a tool for "limited exploration and discovery" of election processes, *In re Gordon*, 218 F. Supp. 826, 827 (S.D. Miss. 1963), rather than a blank check to get troves of data about voters. Failure to respect this safeguard is fatal to Appellant's CRA claim.

### B. Appellant's demand for New Mexico's unredacted SVRL lacked a statement of basis.

The district court correctly found that Appellant's demand "lacks an identifiable 'basis[]'" because it conveyed little more than a "generalized question" about the state's list maintenance. JA 490–91.

Appellant's threadbare conveyance contrasts with the lawful demands for election records by the Attorney General in the 1960s, who accompanied the request for election records with evidence of racial discrimination. *See, e.g.*, *Kennedy v. Lynd*, 306 F.2d 222, 229 n.6 (5th Cir. 1962) (demand referring to information "tending to show that distinctions on the basis of race or color have been made with respect to registration and voting"); *see also Bruce*, 298 F.2d at 861 (same). In other words, "DOJ wrote statutorily compliant demand letters sixty years ago," JA 488, when it "routinely stated . . . [a] basis related to alleged civil rights violations . . . ." *Weber*, 816 F. Supp. 3d at 1182. Yet in this case and in parallel cases, "the Attorney General offered no basis—none." JA 491 (quoting *Galvin*, 830 F. Supp. 3d at 129).

Moreover, "ascertain[ing] New Mexico's noncompliance with the list maintenance requirements of the NVRA and HAVA," Appellant Br. 24 (quoting demand letter), cannot serve as the basis for Appellant's demand. Appellant provided no "factual suggestion that New Mexico has violated the NVRA or HAVA" nor indication of a pattern or practice of noncompliance. JA 490. And, as discussed in Part II, *infra* 14–16,

ascertaining supposed noncompliance with the NVRA or HAVA forms an attempted legal purpose for a demand under the CRA, not a factual basis.

## II. Appellant fails to state a legitimate purpose under the CRA.

The CRA, a civil rights law, requires that the purpose of a demand relate to the investigation of violations of individuals' voting rights. Appellant's proffered purpose—list-maintenance compliance—does not come close. And executive branch public actions and statements reveal the pretextual nature of that purpose.

### A. Appellant's stated list-maintenance purpose does not fulfill the "purpose" requirement of the CRA.

Courts have concluded that "the 'purpose' required in a demand for records under Title III [of the CRA] must relate to a purpose of investigating violations of individuals' voting rights." *Oregon*, 828 F. Supp. 3d at 1105; *see also Amore*, 831 F. Supp. 3d at 157–58 (quoting *Oregon*); *United States v. Warner*, No. 2:26-cv-00156, 2026 WL 2018877, at *7 (S.D. W. Va. July 13, 2026) (same). Because Appellant's stated purpose for its CRA demand of New Mexico's unredacted SVRL was to assess list maintenance practices—and not to investigate violations of individuals' voting rights—Appellant cannot use the CRA to obtain the SVRL.

*First*, statutory construction principles foreclose Appellant's attempt to broaden the acceptable purposes under the CRA. A "fundamental canon of statutory construction [is] that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014). "Statutory construction . . . is a holistic endeavor" and a "provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988). As Appellant acknowledges, Congress enacted the CRA to "cope with the problem" of racial discrimination in voting. *See* Appellant Br. 5 (quoting *South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966)); *see also Benson*, 179 F.4th at 474 ("Congress enacted Title III of the Civil Rights Act of 1960 to help end voting discrimination."). Appellant's assertion that the CRA does not limit demands to the protection of voting rights, Appellant Br. 26, however, divorces the purpose requirement from the rest of the statute and would allow for purposes that have no relation to, and perhaps even undermine, the

statutory scheme.[5] "If the Attorney General could simply justify his demand with a statement of any purpose whatsoever, the requirement that he specify his purpose (and his basis) would be pointless and it would provide him with unfettered authority to demand voting records." *Matthews*, 2026 WL 2212877, at *5; *see also Oregon*, 828 F. Supp. 3d at 1104–05.

*Second*, through the NVRA and HAVA, Congress entrusted list maintenance to the states, not the federal government. *See generally* 52 U.S.C. § 20507 (NVRA); *id.* § 21083 (HAVA); *United States v. Bellows*, 834 F. Supp. 3d 113, 125 (D. Me. 2026). It provided a limited role for DOJ in enforcing these statutes; it would flout Congress' intent to allow Appellant to use the CRA to get around those limitations. *See Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024) ("Where two laws are merely complementary . . . our duty lies not in preferring one over another but in giving effect to both."). The NVRA establishes a comprehensive statutory scheme for voter list maintenance

[5] Appellant also suggests NVRA and HAVA compliance protects voting rights by preventing the dilution of votes cast by lawfully registered voters, Appellant Br. at 29, but never attempts to explain why investigating compliance is a permissible purpose under the CRA, nor how acquiring New Mexico's SVRL will protect voters.

and delegates the administration of that scheme to the states. *See* 52 U.S.C. §§ 20507(a)(4), 20507(c)–(d), 20509. HAVA likewise requires states' chief election officials to "implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level"; tells "appropriate State or local election official[s] [to] perform list maintenance"; and directs that "[t]he specific choices on the methods of complying . . . shall be left to the discretion of the State[s]." *Id.* §§ 21083(a)(1)(A), 21083(a)(2), 21085. Both the NVRA and HAVA include a limited role for DOJ: to bring civil enforcement actions for instances of noncompliance. *Id.* §§ 20510, 21111. With respect to enforcement of the list maintenance requirements, DOJ is limited to challenging a state's general program of list maintenance. *See id.* §§ 20507(a)(4) (NVRA list maintenance provision), 21083(a)(2)(A)(1) (HAVA list maintenance provision); *Weber*, 816 F. Supp. 3d at 1188 ("[T]he NVRA only permits investigations into states' policies regarding reasonable voter roll maintenance."); *see also* JA 481, 483. "Congress did not confer a general auditing power to the DOJ" to conduct audits, question removal rates, or access confidential

information. *Matthews*, 2026 WL 2212877, at *5. And the fact that Congress was silent about the CRA in the NVRA or HAVA demonstrates that Congress did not intend for Appellant to use the CRA to contravene that limited role.

*Third*, even if the CRA could be used to demand records for NVRA and HAVA oversight, the unredacted SVRL would not enable Appellant to ascertain New Mexico's compliance. The SVRL provides only a snapshot of current registrations, not information about how New Mexico operates either its initial registration process or its list-maintenance systems. And here, like in parallel cases, Appellant has given "no explanation for why unredacted voter files for millions of [voters], an unprecedented request, was necessary for the DOJ's investigation." *Weber*, 816 F. Supp. 3d at 1184. As Secretary Toulouse Oliver observed in her September 22, 2025, reply letter, Appellant "made no attempt to explain why such an evaluation would require the inspection of unredacted private voter information." JA 54. Rather than explain, Appellant sued. Having never articulated the purpose for its demand, Appellant asks this Court to "infer that an investigation into a State's compliance with its list-maintenance obligations is based on potential

noncompliance." Appellant Br. 24. But if the Attorney General could compel election records from states anytime he had an open-ended question about compliance and needed no factual underpinning for his demands, then the CRA's reach would be limitless, and its basis requirement would be meaningless.

In short, DOJ must give a legally valid reason of need for the information sought that connects to a legally valid purpose. *See Amore*, 831 F. Supp. 3d at 157; *Oregon*, 828 F. Supp. 3d at 1105; *Matthews*, 2026 WL 2212877, at *5. Exceeding the agency's authority under the NVRA and HAVA to get data that does not address New Mexico's compliance with the NVRA and HAVA does not suffice. Congress created a limited oversight scheme in the CRA. This Court should reject Appellant's attempt to upend it.

**B. Appellant's statement of purpose is pretextual.**

This Court should not accept Appellant's vague assertions of assessing compliance with federal law as the true purpose for its demand. Even at the motion to dismiss stage, courts in parallel cases have considered whether Appellant's stated purpose is the actual purpose of its request.

The record in this case, as well as statements and actions from key government officials, shows that Appellant's purported "purpose" of assessing compliance with federal law is a pretext. "Accepting contrived reasons would defeat the purpose of" judicial review. *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). When agency action is "incongruent with what the record reveals about the agency's priorities . . . [a court] cannot ignore the disconnect between the decision made and the explanation given." *Id.* Courts "are not required to exhibit a naiveté from which ordinary citizens are free." *Id.* (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977)); *see also In re Church of Jesus Christ of Latter-Day Saints Tithing Litig.*, No. 25-4068, 2026 WL 2561896, at *6 (10th Cir. Aug. 31, 2026) ("The courts cannot blind themselves to the realities of modern life."). In many of the cases Appellant has brought against states seeking their unredacted voter files, courts have reviewed statements like those above and refused to accept Appellant's pretextual justifications for uses of "the sensitive information of millions of Americans." *Weber*, 816 F. Supp. 3d at 1184; *see also Oregon*, 828 F. Supp. 3d at 1107 ("When Plaintiff, in this case, conveys assurances that any private and sensitive data will remain private and used only for a

declared and limited purpose, it must be thoroughly scrutinized and squared with its open and public statements to the contrary.”). This Court should do the same. Public actions and statements from federal officials reveal that DOJ is on a “nationwide quest to gather the sensitive, private information of millions of Americans for use in a centralized federal database.” *Weber*, 816 F. Supp. 3d at 1184; *see also Oregon*, 828 F. Supp. 3d at 1106 (same); *Schmidt*, 835 F. Supp. 3d at 699 (“Public statements from government officials reveal its intentions: to create a nationwide voter-database, for potential weaponization in future elections . . . .”); *Amore*, 831 F. Supp. 3d at 158 (rejecting the United States’ effort to “conduct the kind of fishing expedition” it seeks with its demands).

In its quest for sensitive voter data, DOJ demanded unredacted voter rolls from nearly every state in the country and filed lawsuits against 30 states and Washington, D.C., showing that it is engaged in a sweeping effort to amass data, rather than targeted assessments of list maintenance practices.[6] Appellant’s descriptions of its plans for this data have changed over time, revealing their pretextual nature. DOJ’s lawyers

---

[6] Martinez-Ochoa, O’Connor & Berry, *supra* note 3.

admitted at multiple hearings that the United States plans to run voter data through the Systematic Alien Verification for Entitlements (SAVE) program.[7] App. at 165:22–23, *United States v. Amore*, No. 26-1665 (1st Cir. July 17, 2026) ("[O]ur intention is to run this against DHS's SAVE database."); App. at 123:21–23, *United States v. Bellows*, No. 26-1676 (1st Cir. July 17, 2026) ("To the extent that that data may be run against other databases, again, that's something that's been routine . . . ."); *see also United States v. Benson*, No. 26-1225, 2026 WL 2364306, at *12 (6th Cir. Aug. 14, 2026) (mem.) (Thapar, J., dissenting from denial of reh'g en banc) ("The Attorney General then planned to compare the voter file to federal databases . . . ."). Thus, before even receiving any of the information it seeks, Appellant has admitted it will use the data for

[7] On June 22, 2026, however, a district court in the District of Columbia found that the expansion of SAVE, particularly its inclusion of information from the Social Security Administration, was unlawful. *See League of Women Voters v. U.S. Dep't of Homeland Sec.*, 835 F. Supp. 3d 79, 95–96 (D.D.C. 2026) (finding the SAVE program expansion had "haphazardly combined and repurposed the private information of millions of Americans, including citizenship data that they knew to be unreliable"), *stay denied*, No. 26-5243, 2026 WL 2643439, at *1 (D.C. Cir. Sep. 4, 2026). The court also found the federal government had trampled on the privacy rights of American citizens in a manner that threatens the sacred right to vote. *Id.* Thus, at this time DOJ may not run New Mexico's SVRL through SAVE.

purposes far afield from assessing compliance with the NVRA and HAVA. *Cf.* Appellant Br. 26 (arguing that the CRA does not limit the purpose for which Appellant can demand records). Just over two months ago, on July 17, the Secretary of the Department Homeland Security (DHS) threatened to withhold funds and possibly prosecute state officials unless they "scrub" their voter rolls in line with DHS' demands, after apparently running several states' voter rolls through the SAVE program.[8] And DHS' investigations unit recently put out a request for information to find a contractor who can "secure delivery of publicly available voter registration files and voter history files to support Homeland Security Investigations (HSI) fraud detection and data segmentation activities."[9] All in all, Appellant's efforts to sweep up sensitive voter data, run it through federal databases, and redirect law enforcement resources to do so show the pretextual nature of Appellant's stated purpose.

---

[8] Steven Portnoy et al., *Mullin Threatens to Withhold Aid From States That Don't Comply with DHS Election Directives*, ABC News (July 17, 2026, at 2:13 p.m. ET), https://abcnews.com/Politics/mullin-threatens-withhold-aid-states-dont-comply-dhs/story?id=134854708 [https://perma.cc/ZJ7E-DJBW].

[9] *See* Public Voter File Acquisition and Handling, SAM.gov (Aug. 25, 2026), https://sam.gov/workspace/contract/opp/c120b053872c4a6984773f8a413cacad/view.

The executive branch's broader quest has been revealed through a campaign of agency actions, including:

- Between January and March 2025, the Administration issued executive orders that established centralized data keeping systems and ordered agencies to give "full and prompt access to all unclassified agency records, software systems, and IT systems," Exec. Order No. 14,158, 90 Fed. Reg. 8441, 8442, §§ 1, 4(b) (Jan. 20, 2025); required federal agencies to "ensure the Federal Government has unfettered access to comprehensive data from all State programs that receive Federal funding, including, as appropriate, data generated by those programs but maintained in third-party databases," Exec. Order No. 14,243, 90 Fed. Reg. 13681, § 3(c) (Mar. 20, 2025); and directed the Department of Homeland Security (DHS) to provide state and local officials access to government systems to verify citizenship and coordinate with the "DOGE Administrator" to "identify unqualified voters registered in the States," Exec. Order No. 14,248, 90 Fed. Reg. 14005, 14006–07, § 2(b), 2(b)(iii) (Mar. 25, 2025) ("Elections EO").

- In April 2025, the Administration directed the Internal Revenue Service to provide confidential tax information to Immigration and Customs Enforcement (ICE) until courts found it unlawful. *Ctr. for Taxpayer Rts. v. Internal Revenue Serv.,* 815 F. Supp. 3d 1, 18–20 (D.D.C. 2025); *Ctr. for Taxpayer Rts. v. Internal Revenue Serv.*, No. 25-0457, 2026 WL 551105, at *3 (D.D.C. Feb. 26, 2026); *Cmty. Econ. Dev. Ctr. of Se. Mass. v. Bessent,* 818 F. Supp. 3d 228, 234–35 (D. Mass. 2026).
- In May 2025, the Transportation Security Administration reportedly signed an agreement with ICE and has been providing ICE with travelers' information for use in immigration enforcement.[10]
- In June 2025, it was revealed that the Centers for Medicare & Medicaid Services agreed to provide ICE extraordinary levels of detail about Medicaid recipients, including Social Security numbers, birthdays, sex, phone numbers, localities, ethnicities,

[10] Camilo Montoya-Galvez, *Reports of airport immigration arrests come amid increased TSA-ICE collaboration, sources say*, CBS News (July 29, 2026, at 1:15 p.m. ET), https://www.cbsnews.com/news/ice-airport-immigration-arrests-tsa-collaboration/ [https://perma.cc/36MT-N7AM].

and race,[11] although a court order narrowed the available information, *California v. U.S. Dep't of Health & Hum. Servs.*, No. 25-cv-05536, 2025 WL 3751931, at *3 (N.D. Cal. Dec. 29, 2025).

- In March 2026, the Administration issued an executive order on mail voting that directed DHS to create lists of citizens eligible to vote using information from U.S. Citizenship and Immigration Services, the Social Security Administration, and "other relevant Federal databases." Exec. Order No. 14,399, 91 Fed. Reg. 17125, 17125, § 2(a) (Mar. 31, 2026) ("Mail Voting EO").

In these ways and others, over the past year and a half, the federal government has regularly reappropriated and centralized information about Americans, engaging in unauthorized "secondary use[s]" of data, "where information that an individual has given to one agency for a specific purpose is later reused by that agency or by another agency or entity for an entirely different purpose without the individual's

[11] Kimberly Kindly and Amanda Seitz, *Trump administration gives personal data of immigrant Medicaid enrollees to deportation officials*, AP (June 14, 2025, at 1:52 p.m. ET), https://apnews.com/article/medicaid-deportation-immigrants-trump-4e0f979e4290a4d10a067da0acca8e22.

consent."[12] The administration has only stopped this unlawful seizure of data when ordered to do so by the courts.

Appellant's claim that it is seeking voters' confidential data solely to pursue oversight for compliance with federal voter registration law is therefore implausible and cannot constitute "*the* purpose" of its demand under the CRA. DOJ's efforts to acquire unredacted state voter rolls are, instead, part of the executive branch's larger data consolidation project.

## III. Appellant's demand undermines authority over elections that the Constitution reserves for Congress and the States.

The Constitution "assign[s] no role at all to the President" in election administration. *League of United Latin Am. Citizens v. Exec. Off. of the President*, 818 F. Supp. 3d 34, 53 (D.D.C. 2026) (*LULAC II*), *judgment entered*, No. 25-cv-0946 (CKK), 2026 WL 880056 (D.D.C. Mar. 31, 2026). Under the Constitution, the states and Congress share responsibilities for regulating election administration. *See* U.S. Const. art. I, § 2, cl. 1; U.S. Const. art. I, § 4, cl. 1. The notion that the executive

[12] Nicole Alvarez, *The Trump Administration Is Using Americans' Sensitive Data To Build a Digital Watchtower*, Ctr. for Am. Progress (Aug. 25, 2025), https://www.americanprogress.org/article/the-trump-administration-is-using-americans-sensitive-data-to-build-a-digital-watchtower/ [https://perma.cc/LT65-TYUA].

would have the power to regulate federal elections "does not appear to have crossed the Framers' minds." *LULAC I*, 808 F. Supp. 3d at 45 (citing The Federalist No. 59 (Alexander Hamilton)); *see also* Debate in Massachusetts Ratifying Convention, *in* 2 The Founders' Constitution 255 (Philip B. Kurland & Ralph Lerner eds., 1987) ("I know of but two bodies wherein [the power to regulate federal elections] can be lodged—the legislatures of the several states, and the general Congress." (statement of Caleb Strong)). "Congress, not the President, has the ultimate constitutional authority over elections." *California v. Trump*, 786 F. Supp. 3d 359, 381 (D. Mass. 2025); *see also DSCC v. Trump*, No. 26-5193, 2026 WL 2168617, at *5 (D.C. Cir. July 28, 2026) (per curiam) (finding that the Constitution vests the President with "no express authority over the conduct of elections").

Although the president has no constitutional role in elections, this administration has attempted to use the collection and analysis of data to exert authority over election administration. In the first half-dozen complaints in these thirty cases seeking unredacted voter rolls, starting in September 2025, Appellant began its complaints by pointing to the president's March 2025 Elections EO. *See, e.g.*, Compl. at 2–3, *United*

*States v. Weber*, No. 2:25-cv-09149 (C.D. Cal. Sep. 25, 2025), Dkt. No. 1 (quoting Elections EO), *and* Compl. at 1, *United States v. Pennsylvania*, No. 2:25-cv-01481 (W.D. Pa. Sep. 25, 2025), Dkt. No. 1 (same). But by December 2025, Appellant ceased doing so. *See* JA 19–20 (solely discussing CRA); *see also, e.g.*, Compl. at 1–3, *United States v. Wisc. Elections Comm'n*, No. 3:25-cv-01036 (W.D. Wis. Dec. 18, 2025), Dkt. No. 1 (same); Compl. at 1–3, *United States v. Matthews*, No. 3:25-cv-03398 (C.D. Ill. Dec. 18, 2025), Dkt. No. 4 (same). That shift is likely due to court decisions concluding that multiple provisions of the Elections EO "are inconsistent with the constitutional separation of powers and cannot lawfully be implemented." *LULAC II*, 818 F. Supp. 3d at 54 (permanently enjoining provisions purporting to impose new requirements for verifying citizenship for people registering to vote or applying for absentee ballots). Appellant's abandonment of its argument regarding the Elections EO further demonstrates the faulty premise and unconstitutionality of its actions.

Although courts had already declared the Elections EO invalid on separation-of-powers grounds, in early February 2026, the President

called for a "take over" of voting procedures in many states.[13] The Mail Voting EO, issued the next month, illustrates a dogged attempt to put these words into action, which courts have continued to hold is unconstitutional. *See California v. Trump*, No. 25-cv-10810-DJC, 2026 WL 1826535 (D. Mass. June 24, 2026) (enjoining provisions involving the United States Postal Service (USPS) and the creation of citizenship lists as ultra vires and a violation of the separation of powers); *see also U.S. Postal Serv. v. California*, No. 26A305, slip. op. at 1 (Sep. 14, 2026) (preserving injunction that prevented USPS from enforcing final rule that would have restricted mail voting because government was "unlikely to succeed on the merits"). This is an escalation, but not a change in position for this President, who in August 2025 declared that states must do "what the Federal Government, as represented by the President of the United States, tells them" as related to elections.[14] By its own public accounts, the executive's real purpose for collecting sensitive voter data

---

[13] *See* Erica L. Green, Michael Gold & Robert Jimison, *Trump Repeats Call to 'Nationalize' Elections, as White House Walks It Back*, N.Y. Times (Feb. 3, 2026), https://www.nytimes.com/2026/02/03/us/politics/trump-save-act-elections.html [https://perma.cc/7SF5-S9FW].

[14] *See* Donald J. Trump (@realDonaldTrump), TruthSocial.com (Aug. 18, 2025), https://perma.cc/R3KM-525Z.

from New Mexico and other states is to disrupt and take over election processes. Specifically, Appellant seeks to supplant New Mexico's role in list maintenance by substituting its own judgment and process, which violates the constitutional and statutory assignments of election administration duties. *Weber*, 816 F. Supp. 3d at 1175–76. Appellant's role in enforcing federal statutes does not permit it to engage in list maintenance, but only to ensure that the states comply with federal laws. But, as is clear from its repeated statements, DOJ plans to conduct its own analyses to identify voters it deems should be removed from the rolls. If granted, Appellant's demand could make voters less likely to register and turn out to vote. *See Weber*, 816 F. Supp. 3d at 1196. "This risk threatens the right to vote which is the cornerstone of American democracy." *Id.*; *see also Schmidt*, 835 F. Supp. 3d at 699 ("What, a reader rhetorically may ask, could possibly go wrong?"). As with its other unlawful uses of information, Appellant's goal in obtaining and consolidating massive amounts of voter data is to encroach on the constitutionally mandated role of states in election administration.

## CONCLUSION

For the reasons stated above, *amici* Campaign Legal Center and the Brennan Center for Justice respectfully request the Court affirm the district court's dismissal of the Complaint.

Dated: September 23, 2026

Respectfully submitted,

/s/Katherine Hamilton

Katherine Hamilton
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Suite 400
Washington, DC 20005
(202) 736-2200
khamilton@campaignlegalcenter.org

Maura Eileen O'Connor*
Justin Lam*
BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW
777 6th St. NW, Ste. 1100
Washington, DC 20001
(202) 249-7190
oconnore@brennan.law.nyu.edu
lamju@brennan.law.nyu.edu

*Counsel for Amici Curiae*
**Admission pending*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Fed. R. App. P. 32 because, excluding the parts of the brief exempted by Rule 32(f), this document contains 5,870 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared using Microsoft Word (for Microsoft 365 MSO Version 2606) in Century Schoolbook, a proportionally spaced typeface, in 14-point font.

Dated: September 23, 2026

*/s/ Katherine Hamilton*
Katherine Hamilton

## CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2026, I electronically filed a copy of the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Tenth Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: September 23, 2026

*/s/Katherine Hamilton*
Katherine Hamilton